**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Samuel RABINOWITZ, a/k/a Samuel Robbins, Stanford Sikov and Patrick Howard, Defendants-Appellants.**

No. 15138.

United States Court of Appeals
Sixth Circuit.

Jan. 22, 1964.

---

Thomas A. Howard and Leonard Ziskie, Detroit, Mich., for appellants.

William H. Merrill, Detroit, Mich. (Lawrence Gubow, U. S. Atty., William H. Merrill, Chief Asst. U. S. Atty., Detroit, Mich., on brief), for appellee.

Before CECIL, Chief Judge, PHILLIPS, Circuit Judge, and TAYLOR, District Judge.

TAYLOR, District Judge.

The defendants were indicted on five counts for violation of the mail frauds statute (Title 18 U.S.C. § 1341), and for violation of the statute against aiding and abetting (Title 18 U.S.C. § 2) and on one count for violation of the conspiracy statute (Title 18 U.S.C. § 371). At the arraignment each defendant stood mute and a plea of "Not Guilty" was entered for each. Before the trial, defendant Sikov changed his plea to "nolo contendere" and received a suspended sentence.

Defendants, Rabinowitz and Howard, were each found "GUILTY of the charges contained in the indictment." Each was given a sentence of eighteen months and each was made "eligible for parole at such time as the board of parole may determine." Each appealed.

Count One of the indictment alleged in substance that the three defendants devised a scheme to defraud Mrs. Bernice Cummings, Mrs. Alice Hysell, Mrs. Carol Hanko and others of the general public by inducing them by fraudulent representations to purchase a certain brand of knitting machine being offered for sale by said defendants. As a part of said scheme to defraud it alleged that they organized a Michigan corporation known as New York Knitting and Garment Corporation (hereinafter referred to as New York) with themselves as officers, and a Michigan corporation, known as Atlantic Enterprises, Inc. (hereinafter referred to as Atlantic) with themselves as officers; that they rented premises at 18486 Wyoming Avenue, in Detroit, for the operations of both corporations; that they did mail or cause to be mailed post cards to certain recipients representing that the recipient could make money by knitting garments and requesting them to telephone defendants through New York in order to purchase defendants' knitting machines; that they procured telephone service for New York so that the recipients of said postal cards could contact defendants through New

York by telephone to purchase defendants' knitting machines; that as a further part of the scheme to defraud they hired salesmen for New York and furnished them with a brochure or pages therefrom containing false representations or promises, to-wit:

(a) "We are distributors of hand knit garments."

(b) "We wholesale hand knit garments like these to Dept. Stores everywhere."

(c) "There is a profitable market for hand-knit garments."

(d) "Our business is good—We buy from Thousands of Ladies like yourself—All earning money in their spare time at home."

(e) "We buy garments from ladies like yourself, but we never get enough garments."

(f) "Our garments sell fast."

(g) "The more money you make * * * The more money we make!"

(h) "Look at the tremendous profits in knit garments! These knit neckties sell for $1.50 to $2.00. The yarn costs only 25¢."

(i) "Our method is so easy a child can do it."

(j) "We teach you in a matter of minutes, even if you have never knitted before."

(k) "The ever-popular stole, always a best seller."

(l) "The average lady can earn $10 to $25 per week."

(m) "We suggest you put aside part of your profit—This way you are earning money and paying for the machine at the same time."

(n) "This most popular Regina Princess is the only commercial home knitter that duplicates stitches exactly as hand knitting."

(o) "999 out of 1000 women learn the operation in one lesson at our training center."

(p) "We have several big garment orders to fill."

(q) "The company formerly rented the machines but the women prefer to buy them."

(r) "You can pay for the machine out of earnings."

(s) "It will not be necessary to pay for the machine out of personal funds."

and that on or about October 16, 1957 the defendants caused a post card to be placed in an authorized depository addressed to Mrs. Julian Cummings, 37375 Carpathia, Utica, Michigan in violation of Secs. 1341 and 2 of Title 18 U.S.C.

Counts Two, Three, Four and Five were similar except that: Count Two alleged the mailing of a post card on May 7, 1958 to Julian Cummings (same address as Mrs. Julian Cummings); Count Three alleged the mailing on February 12, 1958 of a post card to Mrs. L. Hysell, 11709 Camden, Livonia, Michigan; Count Four, the mailing on May 7, 1958 of a post card to Alice Hysell (same address as Mrs. Alice Hysell); and Count Five the mailing on February 16, 1958 of a post card to Mrs. J. Hanko, 13725 Gander, Roseville, Michigan, all in violation of Sections 1341 and 2 of Title 18 U.S.C.

Count Six was the conspiracy count. It alleged in substance that the three defendants conspired amongst themselves and with divers other persons to use the mails in furtherance of the scheme to defraud by means of false representations and promises as set forth in Count One. More specifically, Count Six alleged the following overt acts in furtherance of said conspiracy:

1. that defendants did each of the acts alleged in paragraphs one through seven of Count One.

2. that defendants placed or caused to be placed in the mails the postal cards referred to in Counts One through Five.

3. that defendant Sikov made arrangements to purchase Regina Princess knitting machines from George Beck.

4. that "The defendant" (sic) arranged and conducted sales meetings at which salesmen of New York were given instructions by defendants.

5. that on or about March 1958, defendants assigned Edward J. Kasmer to attempt to sell an accumulation of knitted goods at New York.

6. that defendant Robbins hired Louis Mahaffey as a salesman for New York in the spring of 1957.

7. that defendant Howard interviewed Kenneth Cullen (sic) for a job as a salesman for New York in the fall of 1957 and after he was hired instructed him in the selling of knitting machines.

all in violation of Title 18 U.S.C. Sec. 371.

At the end of all the evidence, defendants asked to "renew" a motion for a judgment of acquittal on the ground that the Government had failed to produce substantial evidence to warrant the Court in permitting the case to go to the jury. It does not appear from the record that the motion was made at the end of the Government's case in chief. But since the motion was "renewed" we may assume that it had been initially made then.

The appeal challenges in general the sufficiency of the evidence to prove that defendants devised a scheme to defraud in violation of Sec. 1341 of Title 18 or that they conspired to violate the mail fraud statute in violation of Sec. 371 of Title 18. It further raises the questions whether appellants were prejudiced by the admission of certain evidence and whether they otherwise received a fair trial.

As was stated in United States v. Baren, 305 F.2d 527 (C.A.2), where sufficiency of the evidence is attacked, there is no escape from a meticulous review of the record and of the exhibits introduced. In pursuing the review the Court found, at the outset, that none of the score or more of exhibits which, according to the typewritten record, were introduced on behalf of the defendants have been supplied to this Court. Inquiry was made to the Clerk of this Court and by him to the Clerk of the District Court. These exhibits could not be found. In a close case, such a substantial omission in the record places the Court in a very difficult position. And it has been constrained to review with added care that portion of the record by which the Government sought to establish the guilt of appellants.

Briefly the scheme involved the mailing to feminine prospects by New York of post cards of which the following is typical:

"INTERESTED IN MAKING $15.00 TO $25.00 PER WEEK in your spare time doing piece work in your own home?

No experience necessary, we train you. Knowledge of sewing, knitting or reading patterns—helpful—but not necessary.

If you are interested in knowing more about this work at home, telephone

MRS. O'BRIEN,

UNiversity 4–0886."

The telephone number was that of New York. If the prospect called in, she would be visited by a salesman who revealed the money-making plan. It called for the purchase from New York by the prospect of a hand knitting machine at a cost of $300.00 (later raised to $350.00). The prospects were advised

that they could weave certain specified garments on the machine which would be purchased by New York for cash.

There was ample evidence that the knitting machine was well built and, in proper hands, could be used to knit an astonishing variety of garments. Disappointment arose when some users, even after training by skilled teachers employed by New York, could not develop skills and perseverance to knit and sell garments sufficient to defray the cost of the machine much less to net a return of $15.00 to $25.00 per week.

The evidence shows that New York was incorporated in Michigan in late *March 1957 by defendants Patrick J.* Howard and Samuel Robbins. The purposes of the corporation as stated in the Articles of Incorporation were:

"To buy and sell, rent, lease and manufacture, deal in and deal with, store and repair knitting machines of every kind and nature whatsoever.

"To buy and sell yarn and garments and other related items of every kind and nature whatsoever.

"To give francises (sic) and distributorships to dealers, to finance knitting machines and other related items of every kind and nature whatsoever."

Thereafter in May or June of 1957, defendant Sikov purchased an interest in the company and through a company of which he was sole owner assigned the distributorship of the Regina Princess Knitting Machine to New York after which New York discontinued selling the Familia Knitting Machine, and commenced distribution of the Regina Princess.

With the same stated purposes as New York, in February of 1958 Atlantic Enterprises, Inc. was organized by the three defendants. Thereafter Atlantic wholesaled the Regina Princess to other dealers who retailed the machine. After this shift in operation, New York continued through 1958 to retail the machine and to purchase the garments manufactured by those who had purchased machines from it. Atlantic continued to purchase machines until April or May, 1959 from one George Beck. Beck, who held the franchise in this country for the Regina Princess, testified that he sold the machines to the distributor for $60.00 each with the exception of a few requiring air shipping from abroad which sold for $70.00 each. These were in turn sold by Atlantic to the dealers for $100.00 a machine and as indicated the dealers first sold them to the knitters for $300.00 and later for $350.00 per unit. The cost to the purchaser was *greater if there were finance charges.*

The machine manufactured in Austria was manually operated, duplicated the hand knitting stitches with efficiency and speed, and was capable of making 180 stitches in a single stroke of the cam box, as contrasted with the stitch at a time progress of a hand knitter. It had flexibility and could be used for knitting a great variety of garments from baby booties to stoles, sweaters, neckties and dresses. The machine was well constructed and the Government offered to stipulate that it operated effectively and efficiently.

In the opinion of the Court the "inherent utility" of the Regina Princess removes this case from the ordinary run of mail fraud prosecutions. Harrison v. United States, 200 F. 662 (C.C.A.6); Faulkner v. United States, 157 F. 840 (C.C.A.5). Cf. United States v. Staples, 45 F. 195 (U.S.D.C.W.D.Mich). The article sold here was not a worthless stock. The defendants were not running a bucket shop under the pretense of doing real trading; they were not running a "fake" marriage bureau; they were not getting consignments with no intention of remitting. Here the defendants through their companies were selling a sturdy, well designed and well constructed device with unusual capabilities for the fashioning of useful and artistic items of apparel.

The defendants gave their salesmen training of sorts. There was evidence that their first salesmen had been engaged in the promotion of a different brand of hand knitting machine. The newly hired salesmen were sent along with the older ones for training. Three of them testified for the Government. These men made personal contact with the prospects who had been discovered through the replies to the post card quoted above which had previously been sent out from the office of New York.

Harry Weinstein was employed by New York as a salesman in the fall of 1957. He had been out of work two years and answered an ad of New York in the paper. He was interviewed and hired by defendant Robbins, and worked as a salesman for about two months before quitting to become a dealer. He testified that there were no sales meetings that he was instructed by being taken out by another salesman; that when the appointments were given him and he walked in he told the prospective customers he represented New York. He gave them a demonstration on the machine and explained that a user in order to make money would have to put in time on the machine, but did not recall that he told them how much they would have to put in. When asked whether he told prospective customers how much money they would make, he testified that he did not remember exactly. When he became a dealer in Ohio he testified that he purchased garments from the ladies to whom he had sold the machines and resold the garments, but that his dealership did not make a living for him and he gave it up after eight months. On cross-examination he testified that all discussions with prospects were in the presence of the husband and that they were given a blank copy of a work agreement, presumably Exhibit 8, which we shall discuss later. He made sure that the husband approved entering the agreement and testified that in presenting the program he always told the people they were purchasing the machine and could

either pay cash or obtain financing. When a sale was completed he made out a sales slip, Exhibit 10, but the customer was always told to come to the office and take a first lesson before the deal was closed.

Another salesman, Jack Mihaly, testified he was employed by New York for five to seven weeks in 1957 and 1958. He answered an ad in the paper and was interviewed by defendant Howard. He recalled attending a sales meeting at which both Howard and Robbins were present and at which they were told not to say that the garments were being sold to Hudson's since this wasn't true. They were not given sales instructions as such, but various salesmen would go over their presentations and would be corrected by Robbins or Howard. The presentation included a statement that the women would make $10.00 to $25.00 a week. He testified Mr. Cullin "taught me the pitch; then I went out with Mr. Weinstein on calls to see how he had done it." Part of the presentation included a statement that there was a market for the garments. He knew nothing about the market but did recall there were "a bunch of kids" during the Christmas season who were selling. He quit early in 1958 to take a distributorship with Mr. Weinstein in Toledo. They were told by defendants Howard and Robbins they would have to find their own markets for garments. He testified that he sold all garments which they acquired, although he indicated that he sold some merchandise more cheaply in order to develop customers. He testified he used a brochure in Toledo similar to Exhibit 2-B, and that he obtained it from one of the defendants at Atlantic. This brochure incorporated the score or more of alleged false representations quoted above from the allegations of Count 1 of the indictment. On cross-examination, he testified he was taught to knit a few strokes on the machine by Mr. Cullin. In selling he testified that a prospect knew at the end of the presentation she was going to

have to purchase the machine, but that the prospect was required to come to the office of New York and take a lesson before the transaction could be closed. Insofar as he knew, New York always bought the garments from its knitters. "I wasn't in the office too much, but from what I seen, the women were happy." In making a presentation he said he always read the Work Agreement to the prospective purchaser, and that the husband was always present. On re-direct he testified that the purpose of taking a prospect and husband to the company office was to tell them all about the program and that the customer either paid cash or got a loan and financed it. They were also questioned if the wife had time to knit and whether the husband would object to her knitting in the house—the purpose being to see whether they were agreeable to taking on the obligation. Also on re-direct, he testified with regard to the demand for knitted garments, "We would say that they had a great demand for the knitted garments * * *." As to the Toledo distributorship, he testified he was not concerned whether he would make a profit because it sounded so logical. "I don't think that there was any doubt in my mind that I would fail at this venture. Everything seemed so logical. The pieces just seemed to fit together real smooth * * * you are selling a machine, you are making a nice profit on it, you are getting garments, selling garments, and there is a profit in that." He concluded, " * * * I didn't get enough garments to actually make a profit. I was developing my outlets. If I had gotten more garments * * * I am sure there would have been a profit * * * I wasn't getting enough garments, I had a big overhead. I had to sell machines in order to keep up the place, to keep the place going * * * I wasn't selling enough machines, and I wasn't getting enough garments."

The Court has quoted at length from this witness, because his testimony seems to point up the expectations and hopes of the dealers, as well as the strengths and weaknesses of the program.

Wava Frever purchased some 100 machines from Atlantic. She saw the brochure but never had a supply of them. At Atlantic, Robbins furnished instructions for use by her salesmen by means of a tape recording. Atlantic took no garments. She was told it was up to her how to get rid of them. She and her husband set up a corporation for the sale of machines. On cross-examination, she said she was led to believe Atlantic would buy the garments. However, she had previously sold another make of machine and had bought back the garments, and had no difficulty in reselling them to different stores in Battle Creek, but sold them at a loss in order to get rid of them when she found she had to close up. She paid $100 for the machines from Atlantic, paid her salesmen $70 per machine; had one full time instructress and had other overhead expense. She continued to purchase garments trying to make a go of it, until she could get no more machines and had to close up.

A third salesman to testify was Kenneth Cullin, aged 20, who answered an ad in the paper and was interviewed by Howard. He worked six to nine months. He learned from other salesmen. Such sales meetings as they had "were not the instructive type." In his presentation he emphasized the company would buy back garments and help pay for the equipment. He was not specific in stating the number of hours they would have to knit. He was familiar with Ex. 17 (identical with Ex. 2–B) but did not use it as a rule, preferring to explain the program in his own way. A minimum knitting time of 2 to 3 hours a day was suggested but he did not mention the amounts which could be earned. After a few months, following instructions from Robbins, he worked part time at the office explaining the program to people who had had their first lesson. Sometimes he sold

yarn and sometimes he purchased garments. He was not familiar with the resale program, but was told by Robbins or Howard that New York had outlets. Sometimes he closed deals. He made no suggestions as to patterns, this was done by instructresses, although the company from time to time changed the patterns it would accept. He was aware the company once employed school children to sell its garments. Later Robbins and Howard advised they were busy just keeping up with the dealers served by Atlantic, and Cullin and a Mr. and Mrs. Davis became franchise dealers under the name Great Lakes Knitting and Garment Corporation in the area in Detroit where New York had been placing its machines. They purchased machines from Atlantic and it supplied copies of the brochure for use by their salesmen. Cullin's company purchased garments and were able to dispose of about half of an inventory of $6,000.00. No garments were sold by their dealership to New York or Atlantic. On cross-examination, he testified he used the work agreement in making a sale. He advised that New York would buy the garments at a price double the cost of the yarn used in them. The company purchased all garments offered provided they were not faulty. Most of the lessons in weaving were given at the office. His own enterprise as a dealer lasted about six months. " * * * when we went out of business, we actually owed some money to Atlantic * * * they * * * agreed to have all the women who were under our program come to them for their continued lesson and patterns and yarn and to buy back their garments." He testified Robbins and Howard would concentrate on the wholesale business under Atlantic and continue New York to supply women with yarn, patterns and instructions, and to buy their garments for which they still had a demand. In working in the New York office in qualifying a purchaser prior to closing, he mentioned that their work would be on a piece-work basis and there

was never a guarantee of a particular amount. He said Great Lakes kept a supply of needles to replace those which became broken or bent, and they were easily replaceable. In qualifying with New York, sometimes a woman was disqualified if her credit was insufficient to arrange financing. Asked by counsel for defendants whether from his connections with New York it was primarily engaged in selling knitting machines, rather than in buying and selling garments he answered, "From my observations, I would say both." He did not recall saying to Post Office Inspector Wellnitz that the sale of machines was more important to New York than the purchase and sale of garments. On re-cross he stated New York stayed in business after Great Lakes was formed in August, 1958. Great Lakes went out of business for lack of capital; it couldn't sell enough of the program to meet expenses and went broke. They tried to contact prospects near their office and ran out of people to talk to. Too much money was tied up in inventory of garments purchased.

The Work Agreement (Ex. 8) to which reference has been made was a one page contract between New York and a purchaser outlining the conditions for purchase of garments. In large caps at the beginning was the following:

"THIS CERTIFIES THAT NEW YORK KNITTING & GARMENT CORPORATION, 18482-6 WYOMING AVENUE, DETROIT 21, MICH., TO WHOM THIS AGREEMENT SHALL BE ASSIGNED, AGREES TO PURCHASE FROM THE ABOVE NAMED, ALL SALEABLE GARMENTS KNITTED ON THE KNITTING MACHINE PURCHASED SIMULTANEOUSLY WITH THIS AGREEMENT UNDER THE FOLLOWING TERMS AND CONDITIONS:"

The terms were briefly that New York established standards of workmanship for garments. It promised free instructions on the knitting machine and claim-

ed the full right to dispose of the garments. It set the purchase price at double the wholesale cost of yarn in the garment purchased by customer from New York. Materials in garments must be provided by the individual not New York. The Agreement embodied the contract and no outside statements by dealers' agents apply. The purchaser was expressly made a separate business entity and not an employee of New York. The Work Agreement was not a side agreement to the chattel mortgage. And it expressly provided that it placed no limits upon the right of the individual to sell elsewhere at whatever terms and prices he wished. In heavy letters at the end of the conditions was the following:

"I/WE HEREBY HAVE READ AND UNDERSTAND AND AGREE TO THE ABOVE TERMS AND CONDITIONS."

Following the signature lines was an assignment of all right, title and interest in the agreement to New York with a line for signature and a blank for acceptance of the assignment by New York.

Fastened to Exhibit 8 by a paperclip, but unmarked as exhibits were two sheets, one called a "Qualification—Check-List" upon which was recorded certain data about prospect and husband apparently before acceptance; and another sheet called "Explaining Work Agreement" evidently used by salesmen and containing suggested answers to questions which might be raised by prospects about provisions in the Work Agreement.

Reference has been made several times to the brochure, Ex. 2–B, and in the Court's summary of Count 1 of the indictment are quoted nearly a score of the more alluring statements appearing therein. It was a slick finish 24-page pamphlet printed on paper in several colors. There were included some sketchy illustrations. The cover had a drawing of a large stack of what purported to be five dollar bills and at the bottom was the statement "Home Income Plan."

Throughout were illustrations of garments which could be made on the Regina Princess and drawings of a woman with a bank book, of another depositing money in a bank, of a treasure chest with stacks of coins and bills all around it and of a piggy bank with coins dropping into it and the caption "We Suggest You Put Aside Part of Your Profit." On another page was the drawing of a child with the caption, "Is so easy a child can do it." On another page was an actual photograph of a young woman knitting on the machine.

On the back cover was the notation that the brochure was copyrighted in 1958 by Atlantic Enterprises, Inc. with address and the statement "National Distributors of Regina Princess Knitting Machine." It does not appear to have been sent through the mails, but rather distributed in quantities by Atlantic to its franchise dealers. Nor does it appear to have been used much by New York salesmen, although it was the testimony of one or two purchasers from New York that they had seen it. On the other hand, salesmen used some of the ideas found in it in their sales "pitch."

The Government's first witness was Post Office Inspector Ronald B. Beatson who introduced a number of exhibits including two charts, Exhibits 4a and 5a, which purported to be summaries of financial records of New York and Atlantic which were produced pursuant to subpoena. He testified that exhibit 2–I, also missing from the physical exhibits brought up to this Court was a list of 689 names of persons who had purchased machines through New York.

It was argued, perhaps rightly should we get to the point, that the introduction of the charts, copied below, was prejudicial to the defendants in emphasizing the substantial receipts and gross profits of New York and Atlantic from the sales of the machines without any showing of expenses. It was argued also that the emphasis in the charts on receipts and gross profits was calculated to prejudice defendants when compared

with the modest purchases of garments from the knitters. Obviously with over $29,000 in purchases and only an approxi- mate $5,000 in sales of garments to mer- chandisers, this phase of the program was not well organized or successful.

Exhibit 4a.

## "ATLANTIC ENTERPRISES INC.

| | Machine Purchases | Machine Sales to Franchised Deal's |
|---|---|---|
| February 14, 1958 to December 29, 1958 | $166,820.00 | $280,515.00 |

### GROSS PROFIT ON MACHINE & YARN SALES

| Corp. | Mach. Profits | Yarn Profits | Gross Profit |
|---|---|---|---|
| Atlantic Enterprises, Inc. | $113,695.00 | | |
| New York Knitting & Garment Corp. | $186,228.21 | $498.01 | |
| Total | | | $300,421.22 |

### GARMENT PURCHASE LOSSES

New York Knitting & Garment Corp.
Purchases .................... $ 29,163.48
New York Knitting & Garment Corp.
Sales ....................... 4,990.08

TOTAL LOSSES ON GARMENTS PURCHASED ............... $ 24,173.40"

Exhibit 5a.

## "RECEIPTS AND DISBURSEMENTS AS SHOWN BY BOOKS AND RECORDS OF NEW YORK KNITTING AND GARMENT CORP.

| Year | Machine Purchases | Machine Sales | Yarn Purchases | Yarn Sales | Garment Purchases | Garment Sales |
|---|---|---|---|---|---|---|
| 1957 | $28,043.38 | $106,746.99 | $10,563.73 | $ 9,582.18 | $ 9,739.82 | $2,343.76 |
| 1958 | 34,201.33 | 141,725.93 | 20,442.05 | 21,921.61 | 19,423.66 | 2,646.32 |
| | $62,244.71 | $248,472.92 | $31,005.78 | $31,503.79 | $29,163.48 | $4,990.08" |

On cross-examination, Beatson testified that he was aware that Viking Enter- prises was operated by the same people as New York but he had nothing to show that Viking was in the business of selling knitted garments. There were no docu- ments before him as to Viking which would cause him to alter exhibit 4a.

Income tax returns for New York for the year 1957 disclosed that the three de- fendants were paid the following sal- aries: Sikov, $5,006.50; Howard, $5,- 178.26; and Robbins, $5,665.00. The next year, 1958, the Small Business Cor- poration Income return for Atlantic En- terprises, Inc. revealed that each defend-

72

ant received compensation of $25,000.00 for that year.

Sikov's testimony was largely confirmatory of the picture of the operation already obtained from the above review of the evidence. In connection with the brochure which he testified was adapted from one used by a competitor company selling another machine, he testified that the statement therein that a stole could be knitted in forty-five to sixty minutes was true although he could not answer as to additional time required for blocking and adding tassels. The legend on the post card, which has been referred to, he testified was taken from a competitor, but that it was sent out with the knowledge of all three defendants. He said New York did have some purchase orders from companies for garments prior to issuance of the brochure. He said there were sales meetings but he didn't recall attending any. His work involved purchase of machines, yarns, banking, opening mail, securing leads, etc. He worked eight hours a day, five or six days to the week. He handled the printing of the brochure but was vague about its use. He recognized a post card, Exhibit 7, sent out by New York postmarked May 7, 1958 which bore the following legend:

"WE HAVE SEVERAL BIG GARMENT ORDERS TO FILL. YOUR CO-OPERATION IS NEEDED TO FILL THESE ORDERS. IF YOU ARE IN NEED OF YARN OR ADDITIONAL INSTRUCTIONS, PLEASE CONTACT US IMMEDIATELY. DON'T SIT, KNIT! WE NEED THE GARMENTS.
NEW YORK KNITTING & GARMENT DIST.
Detroit 38, Mich.
UN 1.-8567"

But he could not recall any big garment orders shortly prior to that date. He recalled that there was a sales presentation on tape used by salesmen for New York but he wasn't familiar with its contents and had nothing to do with its use. Prices for garments purchased were taken from a competitor. Occasionally the company changed the particular kind of garment it wanted. Mr. Kasmer developed a customer who might want several thousand pairs of booties a week. What garments New York sold it made a profit on—and what it didn't sell would be in inventory. Viking Enterprises, a third corporation with the same stockholders, was formed to market the goods. This company used high school boys as salesmen. Asked the purpose of New York, he replied "To sell machines, garments, yarn." The big demand did not exist in 1957 since the company had an inventory, but "we sold the machine * * * we were confident we could sell the garments." The confidence was based on experimental sales of stoles in 1957, and on conversations with people. Patrick Howard, Edward Kasmer and Dave Carlson handled garment distribution. The company gave unlimited instructions on its machines. New York continued to make its program available a year and a half after it stopped selling machines. Cards were sent out to women to stimulate their interest in taking lessons and knitting. A card was sent out as late as September 2, 1958 reading:

"Effective Tuesday, September 2, 1958, the office hours of New York Knitting and Garment Corporation will be open as follows: Monday through Friday, 9:00 A.M. to 5:00 P.M. Closed all day Saturday. If you have not registered for advance lessons yet, do so now. Garments are needed. Don't sit, knit"

Another card without date was sent out

"Idle factories cannot produce profits. The same is true with your knitting machine. Idle it is a liability. Working it is an asset. Your efforts and cooperation in producing garments will earn you money and fill our garment orders. Don't sit, knit. New York Knitting and Garment Corporation, 18486 Wyoming, UNiversity 1-8567."

He denied that defendants ever schemed, or had any intent, to defraud; they thought they were conducting a legitimate business. The instructresses gave

lessons, and after a woman entered the program there were no additional costs for lessons and there apparently was no limit on the number of lessons.

From the 689 purchasers of knitting machines from New York, the Government called 14 to testify. The first of these witnesses was Anne Thomas who purchased her machine in May, 1958. She financed its purchase but after a couple of weeks realized she could not make the payments and borrowed the money and paid it off. She first heard of New York through the postal card received in the mail asking if she would be interested in making twelve to fifteen dollars a week working two hours a day. She replied and was contacted by phone and an appointment was made to see her when her husband would be home. The salesmen who came said they had a great demand for slipperettes and knitted garments and by working in her spare time she could pay off the machine and make a profit for herself. She agreed to buy the machine that night and received a receipt, but testified she and her husband had to go to the office to close the deal probably the next night. No mention was made of a finance company at her home, but she was taken to a finance company to sign an agreement for the loan. She testified she took six or seven lessons in the making of slipperettes which were supposed to be the easiest to learn. "I sold eleven pairs of slipperettes to them. I took in one order, and after I discovered what they paid me for them, I just couldn't work at it any longer, because it was just a waste of time." It took a long time to make them. She received 75¢ a pair for the slipperettes and was told there was 37½¢ of yarn in one pair. "I did a little fast arithmetic and I would be working for more yarn, so I couldn't afford to do that. So, therefore, I didn't work for them anymore. I didn't bring in any more garments." She took in only one order. On cross-examination, she testified she knew she was purchasing the machine, and that she was told she would receive unlimited lessons. She received lessons from two instructresses

and may have been shown how to push the cam box back and forth the first night. She was told a ten year old child could operate it. It took her about two hours to knit a pair, although her instructresses told her she could make a pair in twenty minutes. "I found that impossible." She received instruction in making stoles and sold two but not to the company. She also sold slipperettes (about fourteen pairs) to her friends charging $1.50 for them. She received various patterns from the company without cost but had difficulty in understanding their use. At the time she purchased the machine she was confident she could make things and understand the use of the machine. " * * * if they told me a ten year old child could work it, why shouldn't I?" She seemed to recall the language of the working agreement. She was provided yarn by New York at wholesale at about 50¢ a skein. The instructress would help you along in making a slipperette but she never saw one made from beginning to end.

Louise Baresi was another purchaser. Her husband signed the sales slip. She, too, received a post card, which said "Do you want to earn money at home?" She answered. Two men came from New York who told her she could earn at least $20.00 per month by selling garments back. "I was told that I was working for them * * * I was told I would be working for them but instead of them having a factory where I would go every day to work, that I was working in my own home * * *." She was told by working an hour or two a day she would undoubtedly earn $20.00 per week, and that there was a great demand for knitted garments. Couldn't make enough garments to make a profit. Sold an order on three or four occasions. She knitted slipperettes and didn't make enough to pay for the machine. She said she didn't know there would be a finance company until she and her husband were signing for the machine. She was shown the basic principles of the machine at that time. She spent maybe twenty minutes.

at the machine and was shown how to cast on. She knew if she didn't work she would earn no money. She was hesitant at first but was told she had nothing to worry about. Her instructresses were patient and cooperative. Occasionally still uses the machine for her family. Company never refused any of her products. She never complained to the company about what she was able to earn. She was not concerned about how the company disposed of the garments it purchased from her. Although she thought at first she was renting the machine she knew it was a purchase before they signed all the papers. She took in excess of ten lessons and made several pairs of slipperettes. She seemed to recall the terms of the purchase agreement. She had no difficulty understanding the patterns and use of machine. She made some sweaters and socks for members of her family. She got one of the "Don't sit. Knit" cards. She said the work was not tedious but she couldn't spend all her time on it.

The testimony of Mrs. Thomas and Mrs. Baresi established the general pattern of the initial contacts and relationship of New York and its representatives with the other fourteen. Their testimony will not be detailed but will be referred to insofar as it throws any additional light on this relationship.

Janet Allen said she was shown the brochure by the representative who came to her home. The signing up was rushed through very fast. She wove booties and slipperettes—and barely made enough for payments. After six months paid if off. Worked six hours a day. Two hours per pair for slipperettes. Mr. Robbins said would make payment on two hours a day. She complained about inadequate return several times. Obtained $12.00 per 80 pairs of booties. Later she admitted it was probably $20.94. Tried to return machine the day after she bought it. Taught nothing until came back from loan company. Instruction difficult because company changed hours and it was hard to get down. Instruction was piece meal. It took about eight trips to learn to make one bootie. Brochure seemed familiar. Saw it at office. Paid about $150.00 on machine through knitting. Only concern in buying the machine was to make money.

Theresa Rechonie said the company furnished card to be used when she came for lessons. Showed her a book much like Exhibit 2–B. Sold about $45.00 of garments. Her husband was out of work. She was anxious to get machine and get to work. Company agreed to purchase garments for which there was a demand. Didn't go for many lessons, had to get a job to pay for machine. Took about twenty lessons. Paid nothing for lessons. Instructresses cooperative. Knew she would be self employed. "My husband was out of work. We were real good bait. To make money * * *" Made slipperettes. Yarn cost $1.50. Slipperettes made therefrom sold for $6.00. Made three stoles. Sold one for $7.00. Made socks for her boys.

Carol Ann Hanko said salesman told her she would have to knit two to four hours a day. Company bought everything she made. Sold about 25 pairs of booties and 15 to 20 pairs of slipperettes. Then she was told to make sunsuits and that is when she quit. Took her two days to make one sunsuit. Made no payment on machine from money coming from sale of garments. Would not have bought the machine had she not been promised she would make enough money to meet the payments on the machine. Tried to take more lessons and was told by an instructress she would have to get a car pool of women and come in together. Couldn't come in for advance lessons alone. Never heard of any other car pools being formed in New York Company. Knitted 8 to 12 hours a day at first—was told by salesman two to four hours would be enough.

Edna Grandy testified she received a brochure, but could not remember the circumstances under which she received it; never paid too much attention to it. Couldn't pay for machine out of earnings.

Mary Sniezek said the salesman showed her a book—like Exhibit 2–B. Was

told she could knit a stole in an hour with the machine. She said it would have taken her months to do so by hand. Wouldn't have bought the machine but for the promised earnings, she wouldn't have wanted to be bothered with the machine. Took two or three lessons. She had just had a baby and didn't have too much time. Salesman didn't go thoroughly into question whether she had time to knit. "I think he was mainly concerned about selling the machine." She thought she could put in two hours a day and make $15.00 a week. Understood she would receive about twice the cost of the yarn. Knitting more complicated than sewing. "I did spend two or three hours at first, and then I realized I just couldn't do it * * * I didn't work on the machine any more." Earned about $1.50.

Bernice Cummings said the salesman said with no children at home she could earn as high as $30.00 per week—could pay for the machine with two or three hours work a day. Only sold 2 or 3 pairs of booties and one sunsuit to New York. Could go only on Saturday and New York not open on Saturday, so didn't go there any more. Expected New York to take care of own bill not a loan company. Wouldn't have bought machine if had known could not make enough to pay for it. More difficult than anticipated. Received about 10 lessons. Difficulty making appointments for lessons—received busy signals. If wanted to knit sweaters, they had no orders for them. Received some instructions from a lady with a different make of machine. Enjoyed working on machine. No charge for lessons. Wanted machine to make garments for grandchildren. Was told hard to get instructresses to come in on Saturdays.

Mattie Sue Buchanan said she saw something like the brochure. She was 71 years old. Never learned to make one garment. Wouldn't have bought machine if hadn't thought could make money with it. Husband not working. Took two or three lessons, but could never learn to make garments. She told salesman she was too old to go into this.

He replied it was so easy a child could operate and learn it. She couldn't use it because it affected her eyes and head. First lesson didn't bother eyes. Hard to get down to take lessons, but she lost interest on account of her eyes.

Katherine Fitzgerald testified, "My understanding from the phone conversation had been that the idea was that they needed knitted garments, they would place their machine in your home and teach you how to run the machine * * * when Mr. Davis came we recognized, of course, that * * * it was * * * a matter of selling the machine to us. And he presented the machine very persuasively * * *. He assured us of a market for the * * * knitted garments * * * he explained that the proceeds of * * * approximately one week's knitting, and at the most, according to the hours we spent, two weeks of a month would meet the payments on the machine. And he made it appear very attractive, that we would have a good income from the machine * * *. It was the understanding that we had to have a trial lesson and that they would find out whether we had enough aptitude that we could have the machine * * * they implied * * * that they sometimes took machines away from people if they couldn't learn how to run them." She testified items were changed from slipperettes, to booties, to sunsuits—a more complicated item. Never sold anything. The machine dropped stitches, never did operate correctly. She knew the machine would have to be financed. Took advanced lessons, because teachers were curtailed in November and the only teacher left gave advanced lessons. Doubted if could have met payments even with a good machine. Instructress told her she had to sell her own knitted goods.

Alice Hysell was the next purchaser who testified. On the evening the salesman brought the machine she tried to get him to leave it with her for an evening in order to try it out, but he didn't leave it. The salesman (Mihaly) said there was a demand for garments and

that they would sell all she could make, and she would be able to meet her payments and have a profit. After some sales of booties and slipperettes, she determined she would have to work three or four hours a day 20 days a month just to meet her payments. She quit when they indicated they would require different garments. She took all the lessons the company offered (more than twenty-five) but hours were inconvenient and the company moved from building to building. Still has and uses the machine and enjoys it. In a year's time she purchased $62.99 of yarn and sold $80.55 worth of garments. Over approximately two years of time she sold $188.91 worth.

Edith Escue was told by the salesman she could easily make enough money working a few hours a day to pay $20.00 a month and still have a profit for herself. She had seen the brochure probably in the hands of the salesman. She spent 10 hours a day including Sundays trying to make payments. Company never refused to take garments she made.

Elizabeth Beattie said when she signed up she interpreted it that a stole a week would meet her payments on the machine although she knew money was involved when they went to the finance company. She made enough the first two months to meet her payments, but the items were changed every two or three weeks and that is where she fell off. She said, " * * * they didn't ask me if I liked it or anything because I had to have them convince me that I could actually earn the money to pay for that because I was doubtful myself. It seemed like $20.00 a month to pay for this machine was quite a bit." She received instructions four times. She worked about 36 hours a week. Had to be careful the machine "made mistakes."

Marian Kanairz said salesman told her machine was so easy to operate they had blind children working on it in a school. What was on the first post card was not true, she couldn't make any money at all. Only grossed about $18.00 in all. Signed for machine after taking first lesson. Took twelve lessons in all.

Another witness for the Government was Leo P. Wellnitz, a postal inspector. He interviewed Kenneth Cullin with respect to the use of the brochure and testified from a memorandum of the interview the next business day thereafter. He stated that Cullin told him he used the brochure in presentation of the sales program to prospective customers.

Edward Kasmer was employed by New York around 1957 or 1958. He answered an ad and was interviewed by Sikov and Robbins. They wanted him to find outlets for the merchandise coming into the office. He worked for four to six months at $400.00 per month—and sold a little over $1,000 to various stores. He brought in a large item for infants' booties from Merchants Soft Goods Company with the following specifications as to packaging. "Thirty-six dozen of No. 1101 infants' booties, assorted colors, polyethylene bag, with header quarter inch hole in header, 79 cents each. Above order to be held until approval of header and package. Above, if approved, to be priced 79 cents." He was told that the Merchants Soft Goods Company advised him "they could sell almost everything we made on that." He told New York he could get purchase orders on the booties if they went into production on it. He worked with one of the instructresses in developing the bootie. This company was a rack jobber which services racks in a supermarket. The packaging required the use of additional employees. The company used children for selling garments from door to door but that sales effort was "petering out" when Kasmer joined the company. His actual sales to Merchant Soft Goods Company were two for $172.80 and $96.00, respectively.

This was the Government's case. In every mail fraud case, there must be a scheme to defraud, representations known by defendants to be false and some person or persons must have been defrauded. United States v. Baren, supra, 305 F.2d at page 528 (a case involving the sale of knitting machines). The scheme to defraud must have included the

intent to do so. Even if the statements complained of were false, defendants must have known them to be false and they must have intended to defraud in order to be found guilty. Frank v. United States, 220 F.2d 559, 565 (C.A. 10). In Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (a scheme for the sale of bonds), the Court said:

"* * * The significant fact is the intent and purpose. The question presented by this indictment to the jury was not, as counsel insist, whether the business scheme suggested in this bond was practicable or not. *If the testimony had shown that this Provident company, and the defendant, as its president, had entered in good faith upon that business, believing that out of the moneys received they could by investment or otherwise make enough to justify the promised returns, no conviction could be sustained, no matter how visionary might seem the scheme.* The charge is that in putting forth this scheme it was not the intent of the defendant to make an honest effort for its success, but that he resorted to this form and pretence of a bond without a thought that he or the company would ever make good its promises. It was with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect, that this statute was passed; and it would strip it of value to confine it to such cases as disclose an actual misrepresentation as to some existing fact, and exclude those in which is only the allurement of a specious and glittering promise. * * *" (Emphasis added.)

At another place it said:

"* * * he was trying to entrap the unwary, and to secure money from them on the faith of a scheme glittering and attractive in form, yet unreal and deceptive in fact, and known to him to be such. * * *"

In Silverman v. United States, 213 F.2d 405, 407 (a scheme to obtain money by claiming to renew published classified listings in a telephone directory), the Court said:

"* * * the law is well settled that, if a scheme is devised with the intend to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact makes no difference. It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension, and that the mail service of the United States was used and intended to be used in the execution of the scheme. * * *"

In Beck v. United States, 305 F.2d 595, 599 (C.A.10), (a case involving the sale of a knitting machine), the Court said:

"* * * intent to defraud the purchasers of the knitting machines was an essential element. In defining the word 'knowingly' as used in the indictment the court explained 'was to insure that no one would be convicted for an act done because of mistake, inadvertence or other innocent reasons.' Concerning the use of the word 'wilfully' in the same instrument, the court said, 'An act is done wilfully if done voluntarily and purposely with a specific intent to do that which the law forbids; that is to say, with evil motive or bad purpose, either to disobey or disregard the law.'"

In that case, as here, the Court said there was some evidence of good faith and of honesty. "But all of appellants' evidence upon this issue, when weighed against the government's evidence, presented a very weak defense."

The Court of Appeals for the Sixth Circuit has in the case of Henderson v. United States, 202 F.2d 400, 404, (a case involving the sale of interests in oil fields), commented on the limitations upon sales talk in a mail fraud case:

"We are of the opinion that the foregoing evidence, although much

of it denied by appellant, sustains the action of the trial judge in overruling appellant's motion for acquittal, and in submitting the case to the jury, and that on the present review such evidence supports the verdict. There was substantial evidence pertaining to misrepresentations of some material facts, such as the manner of acquisition of Tract No. 1, and the consideration paid for both tracts. The depleted condition of both leases, the small consideration paid for them, the lack of interest in them on the part of any of the major oil producing companies operating in that area, the failure of the appellant to retain any interest himself in Tract No. 1, the inflated sale price of the fractional interests, the statements of Henderson to Rout, form a substantial basis for the reasonable inference that Henderson devised and operated under a scheme that was designed to produce substantial funds from credulous investors, but which had no reasonable prospect of success, about which his representations far exceeded the permissible limits of the usual 'sales talk.' A scheme to defraud, within the meaning of the statute, may exist although no misrepresentation of fact is made. (Citing cases.) *Representations as to value, soundness, and worth of securities may go so far beyond the proper limits of the enthusiasm of the normal salesman,* or the mistaken judgment of the honest man, as to impress them with the badge or mark of fraud. (Citing cases.)" (Emphasis added.)

A case from the Sixth Circuit, Harrison v. United States, 200 F. 662, goes rather deeply into the weight to be attributed to sales talk. In that case, as here, a device (a hand operated vacuum cleaner) was promoted by sending through the mails advertisements and correspondence. The machine had an inherent utility. Many sales were made following advertising to persons who had

never seen the machine. The United States Attorney frankly stated that there was no ground for claiming any fraud as to those purchasers who bought after seeing the machine. The critical question was whether statements made through the mails (a) that the machine had a constant and terrific suction (b) that it would clean carpets thoroughly with little or no physical effort and that a child or weak woman could operate it and (c) that it would abolish housecleaning were so exaggerated that they had to be classed as fraudulent. The Court said:

"* * * The new vacuum cleaner was first put on the market in February, 1910, succeeding in respondent's business a somewhat similar, but cheaper and less efficient, device. The first year about 50,000 cleaners were sold. The retail price to the user was $8.50; the agent paid $4.50. The total sales for the first 11 months were $180,000. The device was manually operated, by handles swinging, bellows like, to and from each other; the handles actuated suction pistons in two cylinders; and there were the usual slotted nozzle, settling chamber, and porous fabric bag. Upon the trial, it appeared beyond dispute that the 'New Home Vacuum Cleaner' was an efficient and useful device, sold at a reasonable price. Indeed, the United States Attorney frankly states that there is no ground for claiming any fraud as to those purchasers who bought after seeing the machine, and the great majority of purchasers were of this class. The only fraud claimed is as against those who sent in their money in response to advertising, without seeing the machine and relying on the respondent's circulars and letters; and so we find that the critical question is whether this literature sent through the mails contains fraudulent statements sufficient to support a conviction. We do not fail to observe that in a prosecution of this

character fraud need only be in the underlying scheme, and it is not necessary that the matter sent through the mail should itself contain fraudulent statements; but in this case the fraud in the scheme is predicated solely on the alleged false and misleading statements contained in the circulars, and hence they must be examined.

"They contain no full mechanical description; but they have a picture of the article, and they make clear that it is to be operated by hand. They contain much laudatory matter, and a large number of statements charged in the indictment to be false and fraudulent. We cannot here take the time nor the space to analyze and discuss each of the statements and the evidence on that subject. It is enough to say that the advertising claims most open to criticism are: (1) That the machine has a constant and terrific suction; (2) that it will clean carpets thoroughly with little or no physical effort, and that a child or weak woman can operate it; and (3) that it will abolish housecleaning. In fact, when it was fairly and properly operated, it did have a suction practically constant, and which, while not 'terrific,' was yet quite strong. It would take up light dirt from a board floor or from the surface of a carpet and with little physical effort, and it would clean a carpet thoroughly, if its working was continued for a longer time and with more force. It would not 'abolish housecleaning' in any absolute sense; but, if used to the best advantage, it would diminish and often avoid that periodical taking up and beating of carpets which in many homes stands for housecleaning."

After pointing out that a 12-year old girl operated the machine with success before the jury and without exhausting physical effort, and that 25 witnesses testified that it operated efficiently and that twelve witnesses testified it was un-satisfactory (only some of whom gave it a fair trial), it went on to say:

"The sum of the whole matter is that, if we except extreme phrases like 'terrific suction' and 'abolish housecleaning,' the utterance of which cannot be seriously thought to be criminal, we find that every statement of fact is literally true, or, more accurately, might, under favorable conditions, be literally true; and *nothing remains except that this advertising matter exaggerated the quality and extent of the work the machine would do with slight physical effort, and minimized the physical effort necessary to make the machine do the complete work of which it was said to be capable.* We doubt very much whether this proof would make out the necessary preponderance of evidence in a civil action brought by a party claiming to have been defrauded. *We are quite satisfied that it is wholly insufficient to establish, beyond a reasonable doubt, the criminal intent which is essential to the felony here charged.* We believe the statute here under consideration was never intended to cover such puffing of goods as is found in the vacuum cleaner circulars, and it should not receive a construction which permits such result.

"We do not overlook the evidence of an admission by Harrison that the work of cleaning a room with the cleaner would be too laborious for a child or weakly woman, and that he knew it could not be so used. The advertising claim that the device could be used by a weakly woman would not naturally imply that she could use it for all purposes for which it could be used by any one; and this admission, of uncertain meaning and extent, cannot fairly be construed as sufficient to change the result of the conceded or fully established facts." (Emphasis added.)

The Court of Appeals reversed the judgment of conviction. See also Faulkner v. United States, 157 F. 840 (C.A.5), wherein the Court said that the appellant was simply advertising his business; that even if the advertisements contained some exaggeration, that did not constitute a scheme to defraud.

Finally, we call attention to some language in the charge of Judge Severens to the jury in United States v. Staples, 45 F. 195, 198 (D.C.Mich.), wherein the Court said:

"* * * Now, gentlemen, you are familiar, as the public generally are, with the fact that seedsmen and nurserymen, as well as *all other parties who have anything to sell, have the habit of puffing their wares, and we are all familiar with the fact that it is a very prevalent thing in the course of business to exaggerate the merits of goods people have to sell; and within any proper reasonable bounds such a practice is not criminal. It must amount to more substantial deception* in order to be subject to cognizance by the courts. *A certain degree of praise and commendation of one's goods in business is allowable;* but when that is carried to the extent of obtaining the public's money by means of *actual fraudulent representations,* then it comes under the condemnation of the law. You will consider all of these charges without losing sight of this very prevalent practice, and in reference to this second subject,—that is, the sale of these blueberry plants, and the advertising of them,—you will see whether this is within the range of an ordinary and legitimate business, or whether it goes beyond those bounds, and is a downright deception." (Emphasis added.)

■ What are the facts in our case? The initial contact was made by mail. But no one purchased through the mail. So far as the record goes, every purchaser of a Regina Princess weaving machine did so after seeing it and with one possible exception after having a lesson

on it. This machine was not a flimsy fake. It was excellently designed and well built. One witness testified that she had difficulty with her machine. But her testimony was the exception.

What then must we look to to determine that there was intent to defraud? It is to the statements that were made by the salesmen who followed up the post cards. It does not appear that many of the witnesses, if any, saw and examined carefully the brochure. They were impressed with the covert promise in the initial post card that they could make $15.00 to $25.00 per week in their spare time and with similar statements by the salesmen as to the earning potential on the machine, with its ease of operation ("so easy a child can do it"), ("pay for the machine out of earnings"), ("learn the operation in one lesson"), etc.

This was clearly sales talk. We recognize that the prospective purchasers who were witnesses were marginal workers, that most of them had not engaged in occupations requiring skill and personal application. On the other hand, only 14 of some 689 purchasers became witnesses for the Government. The defendants themselves put on a number of witnesses who testified that they developed great skills on the machines and who although they did not make great sums of money in their use, easily made enough to meet the payments.

The Government makes much of the fact that defendants had no sound markets for the goods which would be produced. Sikov, on the other hand, testified that based on experimental sales of stoles in 1957 and conversation with people, the partners were "confident" they could sell garments. Jack Mihaly, a salesman who became a dealer, said there was never any thought of failure. "Everything seemed so logical * * * you are selling a machine, you are making a nice profit on it, you are getting garments, selling garments and there is a profit on that."

There is every evidence that these defendants had confidence in the machine

and program. They continued even into 1958 to send out cards urging their purchasers to knit. They kept their offices open for the purchase of garments. Mihaly said if they could have gotten garments, he was sure there would have been a profit.

There was sales talk, yes—there were exaggerations. But they were made to people who had seen the machines and could presumably know their own capabilities. That both salesmen and purchasers were mistaken as to this does not spell out an intent to deceive.

The case is reversed and remanded with instruction to dismiss.