**UNITED STATES of America,**
Appellee,

v.

**Morris BAREN, Samuel C. Stein, Strick-Matador Corporation and Strick-Matador Corp. of Ohio, Appellants.**

**No. 104, Docket 26997.**

United States Court of Appeals
Second Circuit.

Argued Nov. 15, 1961.

Decided July 10, 1962.

Vernon C. Rossner, New York City (Edward H. Levine, New York City, on the brief), for appellants, Morris Baren, Strick-Matador Corp. and Strick-Matador Corp. of Ohio.

Jacob W. Friedman, New York City, for appellant, Samuel C. Stein.

Jerome C. Ditore, Asst. U. S. Atty. for Eastern District of New York (Joseph P. Hoey, U. S. Atty. for Eastern District of New York, Jerome F. Matadero, Asst. U. S. Atty. for Eastern District of New York, on the brief), for appellee.

Before SWAN, MOORE and SMITH, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Appellants Morris Baren, Samuel C. Stein, Strick-Matador Corporation (S–M) and Strick-Matador Corp. of Ohio (S–M, Ohio) appeal from judgments of conviction of mail fraud and conspiracy (18 U.S.C.A. §§ 1341, 1342, 371). The individual defendants received concurrent sentences of eighteen months' imprisonment on each of nine mail fraud counts and one conspiracy count. S-M was fined on each of the ten counts and S-M, Ohio on two counts. Defendant Max Jedlicki pleaded guilty and received a suspended sentence. The trial court directed judgments of acquittal as to defendants John Baren and Irving Fluxgold. Defendant Marjay Sales Corp. did not appeal its conviction.

*The Indictment*

Count I alleges in substance that from on or about November 10, 1956 to January 3, 1958 defendants in the offer and sale of Strick-Matador knitting machines to nine named and various other persons "unlawfully devised, intended to devise, and employed devices, schemes and artifices to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises." Counts II through X repeat the allegations of Count I but name, respectively, each of the nine purchasers as the recipient of a postcard alleged to have been mailed as part of the fraudulent scheme. Count XI alleges an unlawful conspiracy.

The representations made in furtherance of the scheme and "well known to be false by the said defendants" were:

"(a) That Marjay Sales Corp., Marjay Corp. and Strick-Matador Corporation were wholesale distributors of hand-knit garments which they sold to department stores and specialty shops everywhere.

"(b) That Marjay Sales Corp., Marjay Corp. and Strick-Matador Corporation had a profitable market for hand-knit garments.

"(c) That up to $15.00 to $25.00 per week could be earned by the average lady working five to ten hours per week at home, making and selling knitted garments to the defendants, made on Strick-Matador knitting machines sold to them by the defendants.

"(d) That the cost of the Strick-Matador knitting machines could be paid by the purchasers through putting aside a part of the profit they derived each week from the sale of knitted garments to the defendants.

"(e) That the defendants would purchase for a period of three years, all garments knitted on the Strick-Matador knitting machine purchased from them, made and blocked to the pattern and specifications determined and furnished by the defendants.

"(f) That 99 out of 100 ladies learn the operation of the Strick-Matador knitting machine in only one lesson at the defendants' school.

"(g) That the Marjay Sales Corp., Marjay Corp. and Strick-Matador Corporation buy hand-knitted garments made on Strick-Matador knitting machines from hundreds of ladies.

"(h) That knitting on the Strick-Matador knitting machine is fifty times faster than knitting by hand.

"(i) That a hand-knitted suit that sells for from $150.00 to $350.00 can be knitted on the Strick-Matador knitting machine in from ten to twelve hours by the average woman.

"(j) That the Strick-Matador knitting machine can be operated by a child, and that a person could learn to operate a Strick-Matador knitting machine in a matter of minutes.

"(k) That a knitted stole can be made on the Strick-Matador knitting machine in from three-quarters of an hour to one hour.

"(*l*) That the purchasers of the Strick-Matador knitting machines would have unlimited instructions at no charge."

Although appellants make certain claims of prejudicial and erroneous rulings of the trial court, their appeal is based primarily upon the ground that the government's evidence did not establish beyond a reasonable doubt appellants' guilt of a scheme to defraud. It is upon this ground that their appeal must succeed or fail.

■ In every mail fraud case, there must be a scheme to defraud, representations known by defendants to be false and some person or persons must have been defrauded. Initially and for purposes of simplification all convicted defendants will be referred to, whether

corporate or individual, as the defendants. In essence, the fraudulent scheme was the sale by defendants to certain members of the public of a mechanical knitting machine known as a Strick-Matador machine. This mechanical device had a row of 164 needles, each one of which would make a knitting stitch at a single stroke of the machine handle. Thus, when properly operated it could perform a knitting process with much greater rapidity than if each stitch were made by hand with ordinary knitting needles. At the outset a fundamental fact must be noted. There is no charge in the indictment that the machine was in any way defective or that it was incapable of performing a satisfactory knitting job. In fact the trial court said, "I agree that the machine is an effective machine, that it can produce work." The question, as the trial court saw it, was "whether it can produce it in accordance with the representations that were made or charged to have been made by Marjay, its officers and employees, * * *" The court believed that "even if one, two, three or four of these misrepresentations fall of their own weight, the jury may find that several of the others, which were important because in the jury's opinion people bought the machine on the basis of those representations, that might be enough."

Where sufficiency of the evidence is attacked as well as the importance (or lack thereof) of the misrepresentations relied upon by the government, there is no escape from a meticulous review of all of this over 4,200-page record and the scores of exhibits introduced.

### The Organization of the New York Company

In 1955, Morris Baren, his father John Baren and Samuel C. Stein, the stockholders of S-M with offices in Buffalo, New York, became the American and Canadian distributors of a German-manufactured knitting machine. S-M granted a large number of distributorships and subdistributorships throughout this country. S-M, in addition, owned the "Knitting Center of Cleveland," operated by Stein. Baren, John Baren and Stein were also the stockholders of S-M, Ohio. Both S-M companies imported and sold the knitting machines, patterns and parts to the distributors. A Knitting Center in Detroit was operated by Baren's brother-in-law.

In December, 1956, defendant Max Jedlicki, having heard of the S-M business through mutual relatives (Jedlicki's nephew being Baren's brother-in-law), sought a New York City distributorship. The general plan called for the sale of the machine to housewives who could make various knitted garments, and then sell the garments back to the distributors. The distributors were to make resales of the merchandise thus acquired to various outlets obtained by them.

As a result, a New York corporation, Marjay Sales Corporation (Marjay), was organized (Jedlicki's attorney and accountant handling the incorporation) and Jedlicki and S-M each became the owners of 50% of the stock. Originally Marjay's checks were to be signed by Jedlicki as President and either Stein or Baren. After July 10, 1957, Baren no longer was authorized to sign.

Marjay's business opened in the middle of April, 1957. Jedlicki and Stein drew salary checks of $150 a week; Baren did not receive a salary but came to New York sporadically and in the beginning period may have (according to Jedlicki; denied by Baren) hired some salesmen. S-M's and Baren's participation with Marjay consisted largely of supplying the printed material which was part of, and necessary for, the selling operation. This material is basic to the government's claim of a scheme to defraud. Fortunately, being in printed form, it obviates the resolution of conflicting testimony.

### The Sales Procedure—or to the Government the Scheme to Defraud

Solicitation of potential purchasers of the machine in the New York area was made by newspaper advertisements and

by mailing postcards supplied by S-M. The ad relied upon in Count I read:

"WOMEN—WOMEN
EARN EXTRA MONEY AT HOME
IN YOUR SPARE TIME EARN
UP TO $1.50 HOUR
KNITTING OR SEWING EXPERI-
ENCE HELPFUL
CALL TODAY!! RE 9–7977"

The postcards (Exhs. 4 and 8) were virtually identical and were mailed first from Marjay's Jamaica office and from New York after the office was moved there. Exhibit 4 read:

"Are you interested in making up to $15 to $25 per week independently? Do you have 5 to 10 hours per week to work right at home? Knitting experience helpful but not necessary. Guaranteed work. No selling involved. If you are interested in knowing more about this work at home, write your phone number below, put in an envelope and mail to:
MARJAY CORP.
170–20 Hillside Ave.
Jamaica, N. Y.
Phone # RA 6–0716"

When responses were received from potential purchasers, the names were given to the various salesmen for personal visitation. To ensure both enthusiasm and uniformity in sales approach, a document referred to as the "Home Sales Pitch" was delivered to the salesmen. The sales pitch captioned with the address of S-M Buffalo is in conversational form and covered all steps to be taken from the initial "Knock, knock, knock" on the door, through the myriad of reasons as to why the machine should be purchased by Mrs. X (Mr. X was always required to be present at the interview). It contained a description of the operation of the machine and its simplicity ("in 99 out of 100 cases, one lesson at our school is sufficient for you to learn the machine completely"), the buy-back plan whereby Marjay agreed to purchase from the purchaser of a machine "for a period of no less than five years" "all garments knitted on the knit-

ting machine" and the purchaser was to receive double the price of the cost of yarn required for the completed garment, and a statement that "most of these women are earning anywhere from $6.00 to $10.00 a week." Then follows a description of the purchase documents, the repurchase of goods agreement with the suggestion that clothes for the family can also be made to advantage. Even that oft-forgotten admonition is included that "nobody ever comes into your home and gives you something for nothing." "You either have to work for it, one way or the other" (Exh. 14). There is no doubt that this sales pitch was a high-powered approach and to many persons might appear to be quite a forced sales presentation. On the other hand, it marks the limits of the salesmen's authority.

S-M also supplied a sales brochure (Exh. 15) which contained twenty-one pages of pictures and written material designed to convey to the prospective purchaser that, if she were desirous of earning money at home and could spare a few hours a day, she could make knitted garments ranging from stoles, neckties and sweaters to a knitted suit as depicted in the illustration which "Sells for $150 to $350 * * * Yes, $350!" and that S-M are wholesalers of hand-knit garments to department stores and specialty shops everywhere. S-M represented that "we purchase garments from independent people * * * like yourself and Business is Good" and that "We can never get enough." The ease of operation is stressed by the claim that "99 out of 100 ladies learn the operation in only ONE LESSON" and "it's so simple A CHILD CAN OPERATE IT!" Other pages of the brochure are devoted to the amount of profit to be expected and the required knitting time for various articles.

After the prospective customer had agreed to make the purchase, a conditional sales contract and a buy-back agreement (Exh. 10) were given to the purchaser, a deposit taken and a machine left at the home. The purchaser would then receive a telephone call to come to

the Marjay office for her first lesson by an instructress. After the first lesson a paper was presented which, if signed, verified the receipt of instruction, satisfaction with the machine and an understanding "that the length of time to make any particular garment varies with the skill of the individual" (Exh. 11). Marjay then turned over the contract to a factoring company, Charge Account Factors, for approval and payment.

The government summarizes its case in arguing that the ads, the postcards, the sales literature and the sales talk were calculated to convey the impression that a purchaser could make a substantial sum of money by working a few hours a day at home in her spare time; that the machine was easy to operate; that there would be unlimited free instructions; that for three years (a change from the "five years" in the sales pitch) Marjay would buy back all garments at twice the cost of the yarn; that the machine could be paid for out of earnings; that Marjay was a wholesale distributor of such garments to department and specialty stores; and that after one lesson the purchaser could produce garments as shown in the illustrations.

Appellants on the other hand contend that the government failed to prove the material representations alleged to be false. They quite correctly argue that the government has produced no proof of instruction ever being refused; that there was no proof that the instructresses who also inspected the merchandise submitted for purchase were part of any scheme to defraud or that they did not exercise their independent judgment as to whether the articles met the required standard; and that the representations as to knitting time may well be subject to rather wide tolerances and, hence, not to be considered as proof of a criminal scheme.

A just and proper resolution of the determinative elements in any mail fraud case is always troublesome but the problem here is particularly acute. Appellants in substance say with great plausibility: we sold a machine mechanically capable of performing the job represented; we hired independent instructresses whose judgment we did not control and we repurchased all garments which met acceptable standards. What difference does it make, therefore, whether we could resell as long as the customer received her money? We are not responsible for the knitting speed because it will vary with manual dexterity and household interruptions and we never assured anyone of precise dollar earnings. And were this all the proof, indeed acquittal might be in order. But the jury's task was not so simple. For over seven weeks the jury saw and heard many witnesses. Naturally the government used as its principal witness, Jedlicki, who pleaded guilty just before the trial, and who expected "that I would get some consideration by testifying as I did" (and did by receiving a suspended sentence). However, Jedlicki testified that from April through October, 1957, "there was an absolutely legitimate business" and that he was not engaged in any scheme to defraud. His realization of his iniquity dawned on him only after he left the business and "[he] realized upon the advice of [his] lawyer that [he] did something wrong * * *" In addition the government called a number of disgruntled purchasers. No one of them had ever been refused additional instruction. No fraud could be predicted upon their actual failures to achieve some of the promised results. Certainly defendants could not be charged with purchaser A giving up after completing only six pairs of baby booties out of an order for a dozen. Purchaser B apparently knitted well and sold her work to Marjay but because she had young children running around and was pregnant became "discouraged because [she] saw no profit in it at all." Purchaser C's perfect work was accepted but she had difficulty in using the machine and "kept dropping stitches all the time." Purchaser D also had difficulty and although she sold her work to Marjay, it required 120 hours to make a dozen pairs of booties. Pur-

**532**

chaser E didn't try to make anything but a baby set and made nothing else because it "was so much trouble." Purchaser F was satisfied with the machine after the first lesson but subsequently discovered that she "couldn't work it." Purchaser G suffered from bursitis and found the machine too hard for her to operate. Purchaser H "never did learn how to use the machine."

The government called two instructresses. Both corroborated defendants' contention that instruction was never refused and that acceptable merchandise was purchased. However, one testified that only three percent of a hundred women to whom lessons were given learned to make finished garments on the machine; the other that "Probably about ten" out of one hundred learned to operate the machine fairly well.

Three salesmen testified for the government in substance to the effect that they had been given the "sales pitch" (Exh. 14); the sales brochure (Exh. 15); a sales kit containing samples of knitwear, an order book and other papers; and a sample machine. Their sales' instructions were received primarily from defendants Stein and Gold (Irving Fluxgold).

Were the government's case to rest upon such testimony alone it would indeed be founded upon a rather insubstantial foundation—at least as to many of the specific alleged misrepresentations. However, it must be remembered that Baren and Stein were familiar with the operations of Marjay. They were instrumental in supplying the sales pitch and the brochure. To the extent that these documents outlined the representations to be made, they must be responsible. Likewise, they knew or were under a duty to know how Marjay was faring in actual practice. They knew that Marjay did not have wholesale outlets anywhere. Without them it would be very conjectural whether Marjay could last for the three years during which it represented that it could buy back knitted garments. The trivial capitalization of Marjay would not permit any real volume of merchandise to be purchased from customers. In addition Baren and Stein must have known as a result of Marjay's experience (certainly they were under a duty to inquire) that most of the purchasers in the area in which Marjay was selling could not produce the results which were so glowingly portrayed in the brochure. A jury might well infer that it was fraudulent to continue to send forth salesmen to solicit the public with representations which practical experience had shown could not be met in actual performance.

To take a single illustration: "A CHILD CAN OPERATE IT." Appellants argue that "operate" does not mean making knitted garments as described in the brochure but merely learning to put the yarn on the needles and to work the handle back and forth. No such far-fetched argument can be accepted. The purchasers were not being induced to buy the machine merely for the physical exercise of pushing a handle back and forth. They were told that in a matter of minutes they could learn to operate the machine which in turn would produce the many garments (some quite complicated) illustrated in the brochure. The general impression made upon the purchasing public by the various representations is to be determined from all of the representations. This is the jury's function. Nor are the various homilies such as "NOBODY GIVES YOU SOMETHING FOR NOTHING" and the hedge clauses such as "I understand that the length of time to make any particular garment varies with the skill of the individual" ironclad defenses.

It should have been perfectly obvious to Baren and Stein that their "average" woman—at least as far as Marjay's territory was concerned—was not able to operate the machine so as to produce the hoped-for garments and the hoped-for financial return. It is true that less than half of the purchasers of all the machines sold by Marjay apparently were interested in the buy-back representation but that feature was stressed in the selling. What the others chose to do is immaterial.

Turning to the defense, appellants called a lady who had been giving lessons on the S-M machine in Detroit for many years. Before the jury she demonstrated the machine's operation and gave a demonstration lesson in knitting technique. She also exhibited various garments knitted by her on the machine. Then appellants produced five witnesses, three of whom were from the Detroit area, who in the Courthouse under deputy marshal supervision proceeded to knit certain specific articles designated by defense counsel. These articles, together with other garments knitted by the witnesses, were received in evidence. The substance of their collective testimony was that their experiences with the machine were satisfactory and that they had enjoyed the benefits of buy-back agreements. Two witnesses from the Cleveland area testified generally to the same effect. Finally defendants Baren and Stein testified at great length as to the nature and extent of their participation in the enterprise and had an opportunity categorically to deny any falsity of representation or any intent to defraud.

█ █ Rarely has any mail fraud case been tried in which every fact relevant to the issue has been so visually and graphically developed as in this case. The jury heard and saw the witnesses for almost two months. The critical area to be explored must be the court's charge. Was the jury properly instructed? The individual defendants here convicted were business men of many years' standing with no previous criminal records. They should not be made the victims of a few disgruntled purchasers who well may have been manually inept or of a co-defendant obviously anxious to save himself. On the other hand an appellate court "should not attempt to usurp the function of the jury" (Stearn v. United States, 4 Cir., 1927, 18 F.2d 465, 468) and in a mail fraud case the court must be mindful of the fact that "It is only necessary to prove that it is a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension,

* * *" (Silverman v. United States, 5 Cir., 1954, 213 F.2d 405, 407).

After the usual generalities, the trial judge stressed the statutory phrases "Knowing them to be false" and "Knowingly" (18 U.S.C.A. § 1341) and charged that unless the government satisfied the jury beyond a reasonable doubt that the acts had been thus committed, they must acquit and that if the acts were done inadvertently or mistakenly "and without an intention to accomplish the purposes which the Government charges them with having sought to accomplish, then the Government has failed to establish all of the material elements of the crime." The jury was told that the issue was "whether the scheme as a whole was one to defraud the various prospective purchasers of machines"—and so it is. In considering this issue, however, the jury was instructed "that if you believe that the defendants believed in the truth of the representations that they made, then it doesn't make any difference if the representations were untrue." The comment in the opinion in Silverman, supra, may well be repeated here that "All testimony tending to show good faith on the part of the appellant [appellants] was admitted in evidence, and the court was very careful to charge the jury upon the subject of good faith" (p. 407).

Despite appellants' able analysis of certain of the alleged misrepresentations, some as immaterial, others as not proved, such an approach does not resolve the crucial issue, namely, "the existence of a scheme with intent to defraud and lack of good faith" (United States v. Shavin, 7 Cir., 1961, 287 F.2d 647, 654). Here, as in Shavin, "The transcript of the evidence as a whole discloses that it was a close question as to whether or not the defendant [defendants] had the intent to defraud or acted in good faith." Unlike Shavin, however, here all relevant testimony was admitted. Although a defendant "cannot be held criminally responsible for every statement or promise made by a salesman who drew upon his

534

imagination, instead of his authority, to close a contract" (Barrett v. United States, 8 Cir., 1929, 33 F.2d 115, 116), both Baren and Stein are responsible for the authority conferred by the sales pitch and the brochure.

■ The testimony as to "why" the purchasers bought the machines was properly admitted (Linden v. United States, 4 Cir., 1958, 254 F.2d 560; Silverman v. United States, supra). United States v. Brown, 2 Cir., 1935, 79 F.2d 321, is not to the contrary. There, proof as to the consequences of the unfortunate purchases went far beyond the bounds of relevancy and could have been introduced only to incite pity and sympathy.

The exclusion of conversations between Stein and possible buyers of knitted merchandise was not error. The trial judge gave defense counsel every opportunity to introduce the desired proof, i. e., that there was no market for small quantities of merchandise; therefore, it was necessary to accumulate large quantities before offering the goods for sale. Counsel's election not to follow the court's suggestion was his own strategy.

■ In summary, an appellate court's primary function in reviewing a long factual case is to ask itself: did the defendants have a fair trial? It would be hard to imagine a more complete portrayal of the facts. Good knitters, bad knitters testified. During the trial five good knitters produced by defendants were knitting vigorously to the point of exhaustion in various rooms of the courthouse. Garments the product of their work in court and garments produced under less strain at home were exhibited to the jury. The instructresses, the salesmen, the principals Baren and Stein all exposed themselves and their testimony to the scrutiny and analysis of the jury. The court's charge fairly presented the issue. Although we can adopt the words from Judge Tuttle's dissent in Getchell v. United States, 5 Cir., 1960, 282 F.2d 681, 692, and say that we "can fully sympathize with an accused who, without any previous criminal

record, finds himself convicted of the crime of mail fraud," two appellate principles control: (1) the evidence must be viewed in the light most favorable to the government; and (2) the verdict must stand unless it is without substantial evidentiary support. By these standards, the judgments of conviction must be affirmed.