**UNITED STATES of America,
Appellee,**

v.

**Everett W. GROSS and L. Mary Gross,
Appellants.**

**No. 19420.**

United States Court of Appeals
Eighth Circuit.

Sept. 29, 1969.

Rehearing Denied Oct. 30, 1969.

A. E. Sheridan, Waukon, Iowa, for appellant.

Asher E. Schroeder, U. S. Atty., Sioux City, Iowa, for appellee.

Before BLACKMUN, GIBSON and BRIGHT, Circuit Judges.

BLACKMUN, Circuit Judge.

Everett W. Gross and L. Mary Gross, his wife, both now about 56 years of age, were jointly charged, in a 20-count indictment returned in December 1966, with violations of 18 U.S.C. § 1343 (wire fraud, seven counts) and § 1341 (mail fraud, 13 counts). Each count concerned a particular wire communication, or letter mailed with accompanying check, on a specified date between May 2, 1962, and October 14, 1963, both inclusive, in furtherance of an alleged check kiting scheme said to have existed from about August 21, 1961, to about October 15, 1963, and to have been operated between Decorah, Iowa, and LaCrosse, Wisconsin.

With retained counsel each defendant pleaded not guilty to all counts. At the ensuing three-day trial in February 1967 the jury returned a verdict of guilty against each defendant on each count. The court imposed on Mr. Gross a sentence of two years on each of the 20 counts; the sentences were to run concurrently and he was to be eligible for parole, under 18 U.S.C. § 4208(a) (2), at such time as the board of parole may determine. Pursuant to the provisions of 18 U.S.C. § 3651, the court suspended the imposition of any sentence on Mrs. Gross and placed her on probation for two years.

The defendants appealed in forma pauperis. Because of error in the cross examination of the defendants' character witnesses, this court reversed and remanded the case for a new trial. Gross v. United States, 394 F.2d 216 (8 Cir. 1968).

The second trial covered three days in July 1968 and was before the same district judge who presided at the first trial. The same attorney represented the defendants but he now served in a court-appointed capacity. Again the jury returned a verdict of guilty against Mr. Gross on each of the 20 counts. However, as against Mrs. Gross, it returned a verdict of not guilty on each of the first nine counts and of guilty on each of the last 11 counts. The court imposed on

Mr. Gross a four-year sentence on each of the first two counts and a two-year sentence on each of the remaining 18 counts; his sentences were to run concurrently and he was to be eligible for parole, under § 4208(a) (2), at such time as the board of parole may determine. Judgment of acquittal was entered for Mrs. Gross on the first nine counts. The court imposed on her a two-year sentence on each of the last 11 counts of the indictment; these sentences were to run concurrently. However, pursuant to § 3651, the court suspended the execution of these sentences and placed Mrs. Gross on probation for two years.

Thus the punishments on the second trial differed from those on the first trial. The differences were (a) that Mr. Gross received a four-year, rather than a two-year, sentence on each of the first two counts and (b) that Mrs. Gross' sentences were suspended only as to execution rather than as to both imposition and execution.

The defendants again appeal.

On the first appeal we said,

"Appellants have urged 26 separate assignments of error, many of them repetitious. We have examined all of them and find that none rises to the status of reversible error excepting only one based upon the government's cross-examination of appellants' character witnesses. Since we conclude that a new trial must be granted, we limit our discussion herein to the point requiring reversal." 394 F.2d at 218.

On the present appeal the defense makes 22 assignments of error. The first eight are the same as the first eight on the prior appeal. Further, we have compared the defense briefs for both appeals and find them virtually identical on these eight points. Seven other assignments on the present appeal (Nos. 9, 10, 11, 13, 15, 19, and 20) were also raised on the first appeal and, again, the respective defense briefs on these issues are substantially the same. These 15 assignments on the present appeal (Nos. 1–8, 9–11, 13, 15, 19, and 20) thus are repetitiously raised and are subject to the argument that they were passed upon adversely to the defense in the first appeal, were resolved at that time, and require and deserve no further consideration now. See Emery v. Northern Pacific R. R., 407 F.2d 109, 111–112 (8 Cir. 1969).

Nevertheless, because this is a criminal case resulting in convictions and because on the first appeal we gave these 15 assignments of error, so far as the published opinion was concerned, only peremptory and passing mention, we pause here to say that the present panel, too, has examined the assignments carefully and also finds that "none rises to the status of reversible error." In order that there may be no question about our position, we comment briefly on these assignments as well as on those which are new to this appeal. They may be grouped:

A. *Assignments Nos. 1, 3, 4, 5, 7, 8, 9, 10 (in part), and 11.* These relate to the indictment and its return and to the district court's refusal to dismiss the indictment.

The defense arguments are (1) that the indictment is legally insufficient because it fails to charge that the representations were false, that the defendants knew they were false, that the defendants intended to defraud, and that someone was actually defrauded; (2) that the five-year limitation period prescribed by 18 U.S.C. § 3282 bars the prosecution because (a) the indictment was returned only on December 6, 1966; (b) it alleges a scheme devised from on or about August 21, 1961 (a date more than five years prior to the return) to on or about October 15, 1963; (c) the "whole gist" of the government's case is the opening of the Gross checking account at the Exchange State Bank in LaCrosse in August 1961; and (d) each charge is based on a scheme said to have been formulated that August; (3) earlier grand juries had refused to indict the defendants; (4) the indictment was returned upon evidence, consisting of bank and Western Union records, unlawfully obtained and wrongfully withheld by the government

after the earlier grand juries had refused to indict; (5) there was an untoward delay in prosecution under Rule 48(b), Fed.R.Crim.P., and a denial of the defendants' sixth amendment right to a speedy trial, because more than three years elapsed between the last act charged in the indictment (October 14, 1963) and the indictment's return; (6) the defense was entitled to have the indictment made more specific or to be favored with a bill of particulars; and (7) the defendants were denied a preliminary hearing.

We discuss these in order:

■ 1. There is adequate allegation of falsity in the indictment's charges. Each count alleges that the scheme was one "to defraud and to obtain money by means of false and fraudulent * * * representations * * * [the Grosses] well knowing at the time that the * * representations * * * would be and were false when made * * *." This surely provides the elements of falsity, knowledge, and intent. It is true that the fourth element which the defense claims to be essential, that of actual loss to a named person, is not alleged in so many words. The purported victims, Bertha Aaby, the Western Union Telegraph Company, and the Decorah State Bank, however, are named.

We recognize, as the defense urges, that in a few opinions there is a broad expression that in mail and wire fraud cases "some person or persons must have been defrauded." See, for example, the two cases which the defense proffers to us, United States v. Baren, 305 F.2d 527, 528 (2 Cir. 1962) (where no supporting authority is cited), and United States v. Rabinowitz, 327 F.2d 62, 76 (6 Cir. 1964) (where only Baren is cited). The Sixth Circuit has quoted its language from Rabinowitz on at least one occasion. United States v. Lichota, 351 F.2d 81, 89 (6 Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 647, 15 L.Ed.2d 540. The Fifth Circuit has picked it up. Bass v. United States, 409 F.2d 179, 180 (5 Cir. 1969). The expressions in Baren and Rabinowitz

were sufficiently significant to persuade at least one federal trial court to instruct its jury that some person or persons must be defrauded. United States v. Brunet, 227 F.Supp. 766, 772 (W.D.Wis. 1964).

Except for the Wisconsin case, we are not convinced that any of these are flat holdings that actual defraudment is an essential element in federal mail and wire fraud. We regard the expressions as general and perhaps overbroadly stated. The Second Circuit, with the author of Baren a member of the panel, has disavowed it and has limited Baren to its facts. United States v. Andreadis, 366 F.2d 423, 431 (2 Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541. The Ninth Circuit has cited Andreadis with approval. Fineberg v. United States, 393 F.2d 417, 419 (9 Cir. 1968). And the First Circuit has refused to accept Baren and Rabinowitz as expressive of a general rule. New England Enterprises, Inc. v. United States, 400 F.2d 58, 72 n. 10 (1 Cir. 1968), cert. denied, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581.

■ What the defense is really arguing, and as it stressed to the jury and at oral argument, is that no one "lost one penny" by the actions of the defendants and, indeed, "everyone but the Gross's profited by the transactions" for the Western Union received its fees, the bank received its service charges and enjoyed the use of the money on deposit, and Mrs. Aaby received her salary and lost nothing. However, Mrs. Aaby testified that she had to borrow $1,400 to make some of the returned checks good. The fact that Mr. Gross eventually reimbursed her for this does not erase the fraud if it originally existed. United States v. Feldman, 136 F.2d 394, 396 (2 Cir. 1943), cert. granted on another issue, 320 U.S. 724, 64 S.Ct. 55, 88 L.Ed. 427, and aff'd, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944).

■ In any event, the usual rule is that a scheme to defraud and its activation do not have to be successful in order to qualify as a crime under § 1341 or §

1343. The language of the statutes certainly imposes no such specific requirement. The weight of the decided cases is to this effect. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Hoffman v. United States, 249 F.2d 338, 341 (9 Cir. 1957); United States v. Whiting, 308 F.2d 537, 540 (2 Cir. 1962), cert. denied, Crowe v. United States, 372 U.S. 909, 83 S.Ct. 722, 9 L.Ed. 2d 718; New England Enterprises, Inc. v. United States, supra, 400 F.2d at 72. This has long been the law of this circuit. Pritchard v. United States, 386 F.2d 760, 764, 766 (8 Cir. 1967), cert. denied, Borchelt v. United States, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104; Atkinson v. United States, 344 F.2d 97, 98 (8 Cir. 1965), cert. denied, 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106; Baker v. United States, 115 F.2d 533, 538 (8 Cir. 1940), cert. denied, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128. We adhere to that principle.

■ 2. We see nothing of substance in the limitations argument. No authority is cited. Although the indictment specifies August 21, 1961, as the beginning date of the scheme period, obviously because it is the date the La-Crosse account was opened, each alleged count offense is a wire or letter sent in the period from May 2, 1962, to and including October 14, 1963, and thus is within five years of the indictment's return. The fact a scheme may extend back beyond the limitation period does not outlaw an offense committed in furtherance of that scheme within the period. Mitchell v. United States, 196 F. 874, 877–878 (9 Cir. 1912), cert. denied, 226 U.S. 611, 33 S.Ct. 218, 57 L.Ed. 381.

■ 3. The indictment was returned by the grand jury at Sioux City on December 6, 1966. No formal attack is made here on the composition or integrity of that grand jury. The suggestion is that earlier federal grand juries at Fort Dodge and Cedar Rapids had refused to indict. The government response is that this is just not true. Whether true or not, the point has no legal significance for a prior submission, not acted upon, is not a bar to a later indictment. United States v. Thompson, 251 U.S. 407, 413–414, 40 S.Ct. 289, 64 L.Ed. 333 (1920); Ex parte United States, 287 U.S. 241, 250–251, 53 S.Ct. 129, 77 L.Ed. 283 (1932); Alexander v. United States, 95 F.2d 873, 881 (8 Cir. 1938), cert. denied, 305 U.S. 637, 59 S.Ct. 99, 83 L.Ed. 409.

■ 4. The argument that the indictment was the fruit of incompetent or inadmissible evidence cannot prevail. Costello v. United States, 350 U.S. 359, 363–364, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Lawn v. United States, 355 U.S. 339, 349–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Truchinski v. United States, 393 F.2d 627, 632–634 (8 Cir. 1968), cert. denied, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed. 2d 103. See United States v. Blue, 384 U.S. 251, 255 n. 3, 86 S.Ct. 1416, 16 L.Ed. 2d 510 (1966).

■ 5. The time factor does not persuade us. In Hodges v. United States, 408 F.2d 543, 547–552 (8 Cir. 1969), we had recent occasion to examine the delay argument in the light of both the sixth amendment and Criminal Rule 48(b). That case and this one are factually different but what we said there has pertinency and is controlling here. Certainly, the statute of limitations has some significance; the indictment here was returned well within the limitation period. Upon its return the case went promptly to trial. We note, furthermore, that there is no claim of lengthy pretrial incarceration, that there is no demonstration of prejudice to the defendants other than the anxiety which impending prosecution would naturally promote, and that we have been shown nothing indicative of an abuse in the trial court's discretion under Rule 48(b). Foley v. United States, 290 F.2d 562, 565–566 (8 Cir. 1961), cert. denied, 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 88. The case relied upon by the defense, Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363 (1965), is distinguishable.

■ 6. The indictment was sufficiently clear and specific. Obviously, the defense knew the subject of the charges

contained in the 20 counts. Furthermore, the point becomes meaningless on the second trial of the same issues. The defense was aware of the full range of the case  The argument is another way of saying that because no loss was sustained ultimately, the prosecution must fail. We have ruled against this contention above.

■ 7. There was no need for a preliminary hearing and no right to have one. These defendants were indicted. They were taken into custody only after the indictment was returned. They were not arrested upon a pre-indictment complaint. Rule 5, Fed.R.Crim.P., and its provisions relating to a preliminary examination before a United States Commissioner have no application in these circumstances. Probable cause has been determined by the grand jury. Jaben v. United States, 381 U.S. 214, 220, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); Vincent v. United States, 337 F.2d 891, 896 (8 Cir. 1964), cert. denied, 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281; Whitehorn v. United States, 380 F.2d 909, 913 (8 Cir. 1967); Spinelli v. United States, 382 F.2d 871, 887 (8 Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.

B. *Assignments 2, 6, 10 (in part), 12, 13, 14, 15, and 20.* These relate to the evidence, its admissibility, and its sufficiency.

The defense arguments here are: (1) The evidence fails to disclose the necessary willful intent because the LaCrosse bank account was opened for a legitimate purpose; the funds deposited there came from various legitimate sources; not all of the money orders purchased at Decorah were deposited in the LaCrosse account; every check written on the account was paid and, until the bank closed the account, not one check was ever returned unpaid; when the account was closed by the bank, Mrs. Gross asked permission to keep it open so that she could make deposits to cover the outstanding checks but was refused this permission; and the defendants always reasonably expected to have funds on deposit when checks arrived for payment. (2) The records of the bank and of the Western Union were not admissible because they were private, were obtained without the consent of the defendants, and were the product of an unlawful search and seizure. Without these records there would have been no indictment or prosecution. (3) The witnesses through whom the bank and Western Union records were introduced were brought into court with ordinary subpoenas and not subpoenas duces tecum. (4) In the 13 mail counts, it was alleged that the checks involved were transmitted by the Decorah bank to the Marquette National Bank of Minneapolis. The Government's theory was that this route would take about seven days for a check to clear, and in the meantime the defendants had the use of money they did not actually have in the bank. At the second trial the defense was able to show that the count checks, or nearly all of them, did not go to the Marquette at all but, instead, cleared through Chicago in less time. This is a prejudicial variance on these counts between indictment and proof. (5) Five government exhibits, purporting to be Western Union records, were improperly admitted. (6) Although the defense moved for acquittal or for a new trial within seven days after the verdict, as required by Rule 33, Fed.R.Crim.P., the defendants were sentenced within those seven days and before the motions were ruled upon. This was a deprivation of due process.

We take these up in order:

■ 1. The evidence is clearly sufficient. On this appeal we must, of course, view the evidence in the light favorable to the government. United States v. Lodwick, 410 F.2d 1202, 1204 (8 Cir. 1969). When we do this, the evidence presents a not untypical picture of check kiting. At first Mr. Gross every few days purchased a Western Union money order for cash from Mrs. Aaby, who staffed the telegraph office in Decorah. The order was payable to National Service School, a Gross enterprise, and

transmitted to LaCrosse. Mr. Gross then picked up the money order in LaCrosse and deposited it in an account in the name of Gross Oil Transport Co. at the LaCrosse bank. Later, Mr. Gross paid for money orders so purchased through Mrs. Aaby not with cash but with checks drawn upon the Gross Oil Transport Co. account. Eventually, Mrs. Gross did some of this money order purchasing, picking up, and depositing. It took about 30 minutes to transmit a money order by wire from Decorah to LaCrosse. On the other hand, it took a number of days for a check to clear from Decorah to La-Crosse by mail through a correspondent bank in Chicago or Minneapolis. It was not Western Union policy to accept a check in payment for a money order; consequently, the Gross checks were made payable to Mrs. Aaby personally and she was responsible for their collection. When the LaCrosse account was closed, returned checks amounting to $1,400 were charged to Mrs. Aaby. She borrowed money to raise this amount and gave her chattel mortgage. The loan was repaid by Mr. Gross in about 2½ years.

During the period from May 1962 through October 1963, 170 money orders totaling $81,925 were identified as sent by Mr. Gross from Decorah to LaCrosse.

A float results from the writing of a check before one has sufficient funds in the bank and then covering that check by a deposit sometime later but before the check arrives for payment. A bank examiner-witness analyzed the Gross account at LaCrosse for the period from September 3 to October 2, 1963. He found the average daily balance to be $594.55 and the average daily deposit to be $1,529.15. The difference of $934.60 he described as the average daily float. The float was consistent throughout the 1962–63 period of the account.

When, during cross-examination, Mr. Gross was asked why he would purchase a money order in Decorah to send to La-Crosse and then would pick it up in La-Crosse and deposit it in the same account on which the check for its purchase was drawn, he replied,

"Yes, it was an accounting proposition as I have explained. There are five or six different sources of funds going into this one account. Rather than having five or six accounts, this money, because this company did not belong to me, I wanted it meticulously accounted for in this manner and it was done that way."

It is established that check kiting is within the reach of the fraud statutes. Stevens v. United States, 227 F.2d 5 (8 Cir. 1955); United States v. Fromen, 265 F.2d 702, 704 (2 Cir. 1959), cert. denied, 360 U.S. 909, 79 S.Ct. 1295, 3 L.Ed.2d 1260; Falconi v. Federal Deposit Ins. Corp., 257 F.2d 287, 291 (3 Cir. 1958); United States v. Lowe, 115 F.2d 596 (7 Cir. 1940), cert. denied, 311 U.S. 717, 61 S.Ct. 441, 85 L.Ed. 466; Williams v. United States, 278 F.2d 535 (9 Cir. 1960). Of course, the statutes require specific intent to defraud. It has been said that even if the defendant knows he has insufficient funds in his account at the time he draws his check, fraudulent intent is negatived by a reasonable expectation that deposits will cover the check at the time it is presented for payment. Williams v. United States, supra, 278 F.2d at 537.

There is, however, adequate evidence here for the submission of the issue of fraudulent intent to the jury and for the jury's verdict. Although the Gross checks were paid as they were presented during the time the LaCrosse account was open, the volume of the checks, the use of immediately cashable money orders balanced by longer-in-transit checks, the drawing of the checks upon the very account in which many of the money orders were deposited, and the unconvincing excuse for the practice are supportive of the jury's findings. That the checks were paid was due to the perpetuation of the system. All checks were made good in the *Williams* case, supra, too, but that fact did not prevent a conviction and its affirmance.

2. The bank and Western Union records were admissible. They were

obviously relevant. The primary defense objection rests upon a theory of privacy. Such records, however, are not the property of the customer, and the customer has no standing to object on fourth and fifth amendment grounds. Dosek v. United States, 405 F.2d 405, 409 (8 Cir. 1968), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461; Galbraith v. United States, 387 F.2d 617, 618 (10 Cir. 1968); Newfield v. Ryan, 91 F.2d 700, 703 (5 Cir. 1937), cert. denied, 302 U.S. 729, 58 S.Ct. 54, 82 L.Ed. 563; Pollard v. Roberts, 283 F.Supp. 248, 259 (E.D. Ark.1968), aff'd, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14. Our case of Schwimmer v. United States, 232 F.2d 855 (8 Cir. 1956), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52, is not in point as it concerned papers which were clearly the property of the accused.

The defense reliance on Zimmermann v. Wilson, 81 F.2d 847 (3 Cir. 1936), is necessarily of small comfort. The case was soon disapproved by the Second Circuit in an opinion by Judge Learned Hand, McMann v. SEC, 87 F.2d 377, 379, 109 A.L.R. 1445 (2 Cir. 1937), cert. denied, McMann v. Engle, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342, and then, although the defense here fails so to note, was modified by the Third Circuit itself in Zimmermann v. Wilson, 105 F.2d 583, 586 (3 Cir. 1939), to bring its "present view" into line "with the overwhelming weight of authority." See De Masters v. Arend, 313 F.2d 79, 85 n. 11 (9 Cir. 1963), dismissed, 375 U.S. 936, 84 S.Ct. 341, 11 L.Ed.2d 269 (1963).

■ 3. The secondary argument that the identifying witnesses were in court only in response to an ordinary subpoena, rather than a subpoena duces tecum, is close to frivolous. No prejudice is demonstrated. The records were in the possession of the district court between the two trials. In addition, they were originally brought to the grand jury by subpoena duces tecum. We fail to see what would have been accomplished by a subpoena duces tecum for the second trial or what was lost without it. The protective provisions of 47 U.S.C. § 605 are not helpful to the defense, for the records were produced for the trial, in any event, within the statute's exception relating to the "demand of other lawful authority."

■ 4. The variance between the indictment and the proof is only as to the route the mail count checks took in traveling from Decorah to LaCrosse. The indictment described each check by date, bank, payee, and amount and, where one existed, by number. The checks were in the possession of the defendants. There was no surprise as to their identity. The only conceivable difference the routing could possibly make was as to the time the check took to clear. This is a difference of degree. Furthermore, the claimed variance does not concern the seven wire counts.

The Supreme Court in Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), observed that the rule that allegations and proof must correspond is based upon the obvious requirements that the accused be definitely informed as to the charges against him and that he be protected against another prosecution for the same offense. Each of these requirements is clearly satisfied here, and the variance point is without substance. Hall v. United States, 372 F.2d 603, 606–607 (8 Cir. 1967), cert. denied, 387 U.S. 923, 87 S.Ct. 2040, 18 L. Ed.2d 979; Corbett v. United States, 89 F.2d 124, 126–127 (8 Cir. 1937); Jacobs v. United States, 395 F.2d 469, 473–475, (8 Cir. 1968); Whiteside v. United States, 346 F.2d 500, 503–504 (8 Cir. 1965), cert. denied, 384 U.S. 1023, 86 S.Ct. 1946, 16 L.Ed.2d 1025.

■ 5. The five challenged exhibits are dummy money order applications. The Western Union supervisor at Cedar Rapids testified that it was the company's business routine to make one of these when the money order is ordered or within a reasonable time thereafter if a formal application has not then been received. The necessary authenticity is established. The exhibits were admissible under the Business Records Act, 28 U.S.C. § 1732. That the identification

witness lacked personal knowledge of the particular exhibits affects their weight and not their admissibility. Woodring v. United States, 376 F.2d 619, 622 (10 Cir. 1967), cert. denied, 389 U.S. 885, 88 S.Ct. 153, 19 L.Ed.2d 182. Further, these exhibits were only cumulative to others.

6. Although, arguably, it might have been preferable procedure for the trial court to have deferred sentencing until after it had acted upon the posttrial motions, we see no prejudice or denial of due process in the timing of the sentencing. The motions were ruled upon two weeks later. They were not ignored. This was, after all, a second trial of the case and one which had become fully familiar to the court, the prosecution, and the defense.

C. *Assignments 16, 17, and 18.* These relate to instructions given, to instructions refused, and to the court's failure to give the defense a copy of its instructions prior to their delivery. Nearly all the argument here is naturally repetitive of other arguments and in line with the theories advanced by the defense. It needs no further comment on our part. We have read the instructions given and compared them with those requested. We regard those given as fair and proper in the aggregate. Most of the material requested is actually covered by the material given. We find no requirement in the rules or elsewhere that a federal trial court give counsel a copy of its instructions prior to delivery. The one instruction as to a defendant's self-interest is answered by our comments in Taylor v. United States, 390 F.2d 278, 284–285 (8 Cir. 1968), cert. denied, 393 U.S. 869, 89 S.Ct. 155, 21 L.Ed.2d 137, but we adhere to the caveat we there expressed.

D. *Assignment 19.* This relates to the presentence report and the manner of its submission. From the reply brief we learn that the defense complaint is that it was denied an opportunity to examine the presentence investigation report. Under the circumstances of this case, we see no error in this. The second

sentence of Rule 32(c) (2), Fed.R.Crim. P., is permissive. See Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); Specht v. Patterson, 386 U.S. 605, 608, 87 S.Ct. 1209, 18 L.Ed. 2d 326 (1967); Friedman v. United States, 200 F.2d 690, 697 (8 Cir. 1952), cert. denied, 345 U.S. 926, 73 S.Ct. 784, 97 L.Ed. 1337; 1966 note of the Advisory Committee on the Criminal Rules, reproduced at 8A Moore's Federal Practice, par. 32.01 [3] (2d. ed. 1969).

E. *Assignments 21 and 22.* These relate to the sentences after the second trial.

It is true, of course, that the sentences imposed after the second trial were less than the five-year maximums permitted by §§ 1341 and 1343. The government would defend the increase in Mr. Gross' sentence on each of the first two counts because the trial court "had the opportunity to consider not only all of the information coming to him through the first trial, but also to have the benefit of a second trial, and the availability of additional pre-sentence reports, together with knowledge coming to his attention involving the defendants during the 17-month period intervening between trials." It is said that the latter included the knowledge that a second mail fraud indictment had been returned against Mr. and Mrs. Gross. The defense suggests that the increased punishment was due to the reversal upon the prior appeal, to this court's order for the release of Mr. Gross on bail pending appeal contrary to the initial decision of the district court, and to other matters. See United States v. Gross, 298 F.Supp. 449 (N.D.Iowa 1968). Since the oral argument, we have been advised by counsel that the other mail fraud charge referred to by the government went to trial and that at the close of the prosecution's case the court directed a verdict for the defendants. We see nothing of special import about the first two counts, as compared with the other eighteen.

This issue obviously must be examined and decided in the light of North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072,

23 L.Ed.2d 656 (1969). The Court there held, in a state case, that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction. A judge is not constitutionally precluded from imposing a heavier sentence in the light of events subsequent to the first trial, such as new evidence adduced at the second trial or received from the presentence investigation "or possibly from other sources." 395 U.S. at 723, 89 S.Ct. 2072. The Court, however, then examined the issue in the light of the Due Process Clause of the 14th amendment. It held that due process

> "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And * * * due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

> "In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal." [footnote omitted]. 395 U.S. at 725–726, 89 S.Ct. at 2080–2081.

■ We naturally assume that what the Court said in *Pearce* about the Due Process Clause of the 14th amendment applies with equal force to the Due Process Clause of the fifth amendment. We therefore apply here the requirements specified by *Pearce*. The record before us does not show affirmatively the reasons for the trial court's imposition of a longer sentence on each of the first two counts on which Mr. Gross was convicted. If it relates in any way to the other mail fraud indictment, the significance of that indictment obviously evaporated completely in the light of the dismissal of that charge at the close of the government's case. With the present record in this condition, our only possible conclusion is that the four-year sentences imposed on Mr. Gross on each of the first two counts cannot be supported.

We find no such defect in the sentences imposed on Mr. Gross with respect to the remaining 18 counts. Those sentences and their concurrency are identical with the sentences imposed after the first trial.

■ We are not impressed with the argument advanced on behalf of Mrs. Gross that, because any sentence after the first trial was suspended both in imposition and in execution, whereas, after the second trial, sentence was imposed and then suspended only as to execution, this violates the principle enunciated in *Pearce*. It is not correct, as the defense argues, that Mrs. Gross was not adjudged guilty after the first trial. The trial court's first judgment of March 29, 1967, specifically reads, "It Is Adjudged that the defendant is guilty as charged and convicted." The court's judgment after the second trial reads identically to this extent. The result was the same, for on both occasions Mrs. Gross was placed on probation for two years.

We have meticulously read the defense briefs. We have not overlooked any issue raised or suggested in those briefs. If any point has not been mentioned in this opinion, it is because we feel it to be without merit.

The judgment as to L. Mary Gross is affirmed in its entirety. The judgment of conviction of Everett W. Gross is affirmed. The sentences imposed upon him on the last 18 counts of the indictment are affirmed. Those imposed upon him on the first two counts are vacated. His case is remanded for resentencing as to those two counts; the new sentence on each of the two counts is not to exceed that imposed at the first trial.