UNITED STATES of America,
Appellee,

v.

William L. RIDDICK and Thomas B. Wallace, Appellants.

No. 75–1060.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1975.

Decided July 15, 1975.

James E. Ferguson, II, Charlotte, N. C., for appellants.

O. H. Storey, III, Asst. U. S. Atty., Little Rock, Ark., for appellee.

Before GIBSON, Chief Judge, and HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Appellants Riddick and Wallace were tried and convicted on both counts of a two-count indictment for conspiring to violate 42 U.S.C. § 2703(a) by misapplying and obtaining by fraud monies, funds, assets and property which were the subject of Office of Economic Opportunity grants. Following jury verdicts of guilt, each appellant was sentenced by the Honorable Oren Harris to concurrent three year terms on the two counts. Both defendants rely upon the following three points in this appeal: (1) That the trial court erred in the admission of a statement by a co-conspirator which was not made in furtherance of the conspiracy; (2) that the trial court erred in refusing to give an instruction to the jury concerning the testimony of a witness who allegedly testified under a grant of immunity; (3) that the admission of subpoenaed bank records violated defendants' protected Fourth, Fifth and Ninth Amendment rights. We affirm.

Defendants William L. Riddick, Thomas B. Wallace and Ronald Palmer were charged in a single two-count indictment with conspiring to misapply funds which were the subject of Office of Economic Opportunity (OEO) grants made to Community Investment and Development, Inc. (CIDI), an Arkansas non-profit organization established under the Economic Opportunity Act of 1964. Defendant Palmer, a former vice president of CIDI, entered his guilty plea prior to trial. George B. Mays, former president of CIDI, was named in the indictment as a co-conspirator and not as a defendant. Prior to the instant trial, Mays pled guilty to one count of a 16-count indictment charging misapplication of funds.

The alleged scheme was that Riddick, who controlled the flow of funds from OEO to CIDI, had conspired with Wallace, a private North Carolina consultant, and the CIDI officers, Mays and Palmer, to establish sham consulting contracts between CIDI and Wallace. The consulting contract fees of $4,000 (Count I) and $15,000 (Count II) were allegedly divided among the four participants.

## I. STATEMENT OF CO–CONSPIRATOR

The government called Mr. Glenn June, former consultant and employee of CIDI, who had worked with Mays and Palmer. June testified that he had been tried and convicted on charges of misapplication of government funds in connection with CIDI and that he was then serving time at the Federal Medical Center for prisoners.

June testified that about June 3, 1975, he had accommodated Wallace and Palmer after banking hours by cashing a $1500 CIDI check [kickback] payable to Wallace. He gave Wallace and Palmer $300 cash and his personal check for $1200, which was cashed the following day. The check bore the endorsements of conspirators Tom Wallace and Ron Palmer.

Witness June testified that thereafter, in late June or early July, he had the following conversation with Palmer in Palmer's office:

Q. Mr. June, I believe I was asking you if Mr. Palmer had a conversation with you in regards to Mr. Wallace as a consultant and Mr. Riddick.

A. He told me that they had some extra money coming down from Washington and the only way they could get it was to use Mr. Wallace as a consultant and then somebody would split on some of the money, and that's about all I knew about that deal.

Q. Do you recall who he said would split the money with Mr. Wallace?

A. Mr. Riddick.

Shortly thereafter, on July 18, 1972, Mays wrote Riddick requesting a further allocation of funds for CIDI. This formally set in motion the $15,000 kickback scheme charged in the second count of the indictment.

Appellants contend that Palmer's statements implicating Riddick and Wallace were not made during the course of and in furtherance of the conspiracy and are therefore hearsay statements which prejudiced the case. We disagree.

■ This court has held that statements by a co-conspirator are not hearsay and are admissible so long as there is independent evidence of concert of action. *United States v. Buckhanon*, 505 F.2d 1079, 1084 (8th Cir. 1974). We have not limited the rule to statements of conspirators who are defendants at the trial. *United States v. John*, 508 F.2d 1134, 1143 (8th Cir. 1975); *United States v. Richardson*, 477 F.2d 1280, 1283 (8th Cir. 1973).

■ The disputed statement here was made by conspirator Palmer during the course of and in furtherance of the conspiracy. The clear implication from June's testimony was that he and Palmer had discussed the payments to Wallace in conjunction with the previously cashed CIDI check and plans for securing an additional allocation of funds to CIDI. There was ample independent evidence of a continuing concert of action involving the receipt of kickbacks. At the time of trial, Palmer had pled guilty to one count arising out of the conspiracy. It follows that the statement was clearly admissible. *Cf. United States v. Buckhanon, supra.*

## II. IMMUNITY INSTRUCTION

George B. Mays was an unindicted co-conspirator in the alleged scheme and a principal witness for the government. Mays testified as to his personal knowledge of the agreement with Riddick.

The trial court instructed the jury as to the testimony of an accomplice.[1]    He

---

1. The court's instruction was as follows:

Furthermore, the Government called as a witness a person named as a co-conspirator in the Indictment. In the prosecution of crimes, the Government is frequently called upon to use witnesses who are accomplices. Often it has no choice. The Government must rely upon witnesses to transactions, such as they are. Otherwise, in many instances, it would be difficult, if not impossible, to detect and prosecute alleged wrongdoers. This is particularly so in cases of conspiracy, and where a com-

further gave the conventional instructions regarding credibility and testimony of a convicted felon.

Appellants contend that they were entitled to a separate instruction pointing out the unreliability of informants' testimony. They specifically argue that the jury should have been instructed that Mays received immunity for his testimony.

■ The court did not abuse its discretion in refusing to give the informant instruction or in refusing to mention immunity. Mays was not given immunity from prosecution. He pled guilty to one of 16 counts of violations related to the charges in the instant case. It came out on direct and cross-examination that Mays received a 24-month sentence with six months to serve and $1,000 fine; that the United States Attorney made no recommendation as to sentencing; that the remaining 15 counts were dropped; that there was an informal agreement that no further prosecution would be pursued on related charges; and that Mays agreed to cooperate and tell the truth without any threats or further promises having been made.

Mays was extensively cross-examined concerning the dismissal of the 15 counts and the agreement not to prosecute related charges. Mays' testimony was extensively corroborated by documentary evidence.

Under the circumstances of this case we are satisfied that failure to give an informant instruction was not error. We find the following comments of the District of Columbia Court of Appeals most appropriate:

> To mandate an informant's instruction on this record would be tantamount to a rule requiring the trial judge to warn the jury to receive with suspicion the testimony of any Government witness who has recently pleaded guilty to an offense less than charged, or to only one out of multiple charges. There may be instances where such a suspicion is well-founded, but a judicial instruction of automatic suspicion cannot be justified. Plea bargaining is an everyday occurrence even when neither information nor testimony is sought, and is a practice sanctioned by the Supreme Court. In these so-called bargains the lesser plea may be only a fair scraping away of overcharging, or an awareness that additional prosecutions would likely result in concurrent sentences and be an unsound use of the resources of administration of justice.

*United States v. Lee*, 506 F.2d 111, 122 (D.C.Cir.1974) (footnote and citation omitted).

The defendants' rights were protected by the instructions given by the court and by the rigorous cross-examination and vigorous final arguments to the jury.[2] Upon the circumstances of this case we find no prejudice. *See Lee, supra; United States v. Smith*, 464 F.2d 221 (8th Cir. 1972); *United States v. Holmes*, 453 F.2d 950, 952 (10th Cir. 1972).

---

mon scheme is alleged. Conspirators do not publicly proclaim their intentions or operate in public. Conspirators necessarily are often secretive and devious in their activities, and clandestine in their meetings. Frequently it happens that only members of the conspiracy have evidence which is relevant to and important in the case. The testimony of these witnesses, who are accomplices, must, as a matter of law, be considered by you with close and searching scrutiny and caution.

I am not saying that, because a person is an accomplice or co-conspirator, he is not to be believed; for, if this were so, many cases in this court could not be proven.

Accomplice testimony should be compared to the facts you find to exist in the case, and then such testimony should be given such weight and value as you deem proper in all the circumstances considered in conjunction with each other.

Accomplice testimony, by itself, is sufficient to convict, if it convinces you of the defendant's guilt beyond a reasonable doubt, even if the testimony of the accomplice is uncorroborated.

2. Counsel for the defendants argued that the reason Mays testified was to "save his own neck"—that under the 16 counts he could have received 32 years in jail and paid $160,000 in fines.

Appellants mention on appeal that the accomplice instruction as given by the court was rehabilitative in nature and tended to favor the government. We view the instructions as a whole. The trial court has considerable latitude in commenting on the evidence. *United States v. Eagan*, 516 F.2d 1392 at 1393 (8th Cir. filed May 8, 1975), and citations. If the trial court erred in this regard, we are satisfied that the error was harmless. The testimony of accomplice Mays was thoroughly corroborated by documentary evidence.

## III. ADMISSIBILITY OF SUBPOE-NAED BANK RECORDS

The final appellate point is that the admission of certain bank records—signature cards, bank statements and deposit slips from Riddick's bank in Washington, D. C. and from Wallace's bank in North Carolina—was constitutionally unsound.

The records in question were obtained through lawful grand jury and trial subpoenas. They served the government's case by demonstrating the final transactions of the conspiracy. The records showed that deposits were made to appellants' accounts and that cash withdrawals corresponding with the government's theory of the case were made on the deposit dates.

The argument is that these records are the personal property of appellants and are tantamount to private papers in which appellants have an expectation of privacy protected by the Fourth, Fifth and Ninth Amendments to the United States Constitution. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

This court has held that bank customers in cases such as this have no standing conveyed by the Fourth or Fifth Amendment to challenge lawful subpoenas issued to banks for bank records. *United States v. Gross*, 416 F.2d 1205, 1212–13 (8th Cir. 1969); *Dosek v. United States*, 405 F.2d 405, 409 (8th Cir. 1968). Counsel concedes that if we are to sus-

tain his position, we must depart from those holdings. We would also be required to oppose all of the other authority we have found. *See Harris v. United States*, 413 F.2d 316 (9th Cir. 1969); *see also* cases cited in *United States v. Miller*, 508 F.2d 588 at 590–91 (5th Cir. 1975) (dissenting opinion). We decline to do so.

Appellants would have us reach a contrary result premised primarily upon *United States v. Miller*, 500 F.2d 751 (5th Cir. 1974), *petition for rehearing and rehearing en banc denied*, 508 F.2d 588 (5th Cir. 1975) (and see dissenting opinion). The *Miller* panel apparently conferred standing upon a bank customer to challenge a faulty grand jury subpoena for bank records. The court relied heavily upon *California Bankers Association v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). The *Miller* panel had this to say:

The [Supreme] Court, however, did not choose to abandon 90 years of precedent by proclaiming open season on personal bank records. Indeed, in rejecting the Fourth Amendment claims of bank depositor plaintiffs, the *California Bankers* majority, in an opinion by Justice Rehnquist, relied heavily upon the proposition that depositors have adequate legal protection from improper government access to their records:

We see nothing in the Act which violates the Fourth Amendment rights of any of these plaintiffs. Neither the provisions of Title I [Recordkeeping Requirements] nor the implementing regulations require that any information contained in the records be disclosed to the Government; both the legislative history and the regulations make specific reference to the fact that access to the records is to be controlled by existing legal process.

416 U.S. at 52, 94 S.Ct. at 1513, 39 L.Ed.2d at 835. Surely a purported grand jury subpoena, issued not by the court or by the grand jury, but by the

United States Attorney's office, for a date when no grand jury was in session, and which in effect compelled broad disclosure of Miller's financial records to the government, does not constitute sufficient "legal process" within the meaning of the majority opinion [footnotes omitted].

We find no fault with that language or with the language of *California Bankers.* We also agree and are mindful of the admonition of Justice Powell, 416 U.S. at 79, 94 S.Ct. 1494 (concurring), that there are cases where legitimate expectations of privacy will arise. *See, e. g., Miller, supra,* 508 F.2d at 592 & n. 7; *see also California Bankers, supra,* 416 U.S. at 51, 94 S.Ct. 1494. This, however, is not such a case.[3] In this case we have lawful grand jury and trial subpoenas issued pursuant to "existing legal process." *California Bankers, supra,* 416 U.S. at 52, 94 S.Ct. 1494. We are not prepared to extend the law of this circuit beyond the protections inherent in those procedures. *See Branzburg v. Hayes,* 408 U.S. 665, 688, 707–08, 92 S.Ct. 2646, 33 L.Ed.2d 626. Under the circumstances present in this case, where lawful legal processes have been employed to subpoena bank records, we cannot say that the necessary expectation of privacy has been shown warranting a valid constitutional attack. *See Couch v. United States,* 409 U.S. 322, 335–36 & n. 19, 93 S.Ct. 611, 34 L.Ed.2d 548; *Katz v. United States, supra,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576.

Having carefully considered the record, appellants' contentions, and the applicable law, we are satisfied that both Riddick and Wallace received a fair trial free of prejudicial error. The evidence of guilt was overwhelming. The jury arrived at its verdicts of guilt in less than an hour.

Affirmed.

---

**3.** We note that the Supreme Court observed in *California Bankers:*

> We decided long ago that an Internal Revenue summons directed to a third-party bank was not a violation of the Fourth Amendment rights of either the bank or the person under investigation by the taxing authorities. See *First National Bank v. United States,* 267 U.S. 576, 45 S.Ct. 231, 69 L.Ed. 796 (1925), aff'g 295 F. 142 (S.D.Ala.1924); *Donaldson v. United States, supra,* 400 U.S. 517 at 522, 91 S.Ct. 534, 538, 27 L.Ed.2d 580 (1971). "[I]t is difficult to see how the summoning of a third party, and the records of a third party, can violate the rights of the taxpayer, even if a criminal prosecution is contemplated or in progress." *Id.,* 400 U.S. at 537, 91 S.Ct. 534 (Douglas, J., concurring).